

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-2-2006

# Yarris v. Delaware

Precedential or Non-Precedential: Precedential

Docket No. 05-1319

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Yarris v. Delaware" (2006). *2006 Decisions.* Paper 266.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/266

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1319

———

NICHOLAS YARRIS

v.

COUNTY OF DELAWARE; BARRY GROSS, ESQUIRE;
WILLIAM H. RYAN, JR.; DENNIS MCANDREWS,
ESQUIRE; OFFICE OF DISTRICT ATTORNEY OF
DELAWARE COUNTY; CRIMINAL INVESTIGATION
DIVISION, RANDOLPH MARTIN, Criminal Investigation
Division, Office of the District Attorney Delaware County;
DAVID PFEIFER, Criminal Investigation Division, Office of
the District Attorney Delaware County; CLIFTON MINSHALL,
Criminal Investigation Division, Office of the District Attorney
Delaware County; CRAIG SITI, Investigator, Criminal
Investigation Division, Office of the District Attorney Delaware
County,
                                                          Appellants

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 04-cv-03804)
District Judge: Honorable Juan R. Sánchez

———

Argued April 24, 2006

Before: FUENTES, STAPLETON, and ALARCÓN,[*] Circuit
Judges.

(Filed: October 2, 2006)

John W. Beavers, Esq. (Argued)
John Wendell Beavers & Associates
1518 Walnut Street, Suite 800
Philadelphia, Pennsylvania 19102
        Counsel for Appellee

William F. Holsten, II, Esq.
Robert P. DiDomenicis, Esq.
Paola T. Kaczynski
Holsten & Associates
One South Olive Street
Media, Pennsylvania 19063

William J. Convoy, Esq.
C. Scott Toomey, Esq. (Argued)
Campbell Campbell Edwards & Convoy
690 Lee Road, Suite 300
Wayne, Pennsylvania 19087
        Counsel for Appellants

_____

OPINION OF THE COURT
_____

FUENTES, Circuit Judge.

Nicholas Yarris claims he spent twenty-two years on death
row for a kidnaping, rape, and murder he did not commit because

_____

[*] The Honorable Arthur L. Alarcón, Senior Judge, United
States Court of Appeals for the Ninth Circuit, sitting by
designation.

Delaware County, its prosecutors, and its detectives obscured and destroyed evidence pointing to the actual killer, manufactured evidence against him, and thwarted his demands for DNA testing. After Yarris's conviction was overturned and the charges against him were dropped, he filed this action under 42 U.S.C. § 1983 alleging violations of his rights under the United States Constitution and Pennsylvania law. The prosecutors and detectives moved to dismiss Yarris's claims on the basis of absolute and qualified immunity. The District Court denied the motion to dismiss in part, and this appeal followed. We are asked to determine whether the District Court properly concluded that the prosecutors and detectives are not entitled to immunity from any of Yarris's claims. For the reasons that follow, we will affirm in part, reverse in part, and remand for further proceedings.

## I. Background

### A. Factual Background[1]

In 1981, Yarris was arrested and charged with attempted murder after assaulting a police officer during a traffic stop. Yarris was subsequently placed in solitary confinement in a Delaware County prison. Yarris was addicted to methamphetamine at the time of his arrest, and he began suffering from "cold turkey" withdrawal.

While in prison, Yarris learned from a newspaper of the unsolved kidnaping, rape, and murder of Linda Mae Craig, which took place four days before Yarris's arrest. In an effort to bargain for release from prison, Yarris told Delaware County detectives Randolph Martin ("Martin") and David Pfeifer ("Pfeifer") that he had information about the Craig murder. He told the detectives that a fellow drug addict had admitted to raping and murdering Craig, but that the addict had since died from a drug overdose. In

---

[1] Because this is an appeal of the District Court's denial of absolute and qualified immunity at the motion-to-dismiss stage of the proceedings, we accept Yarris's allegations as true and draw all reasonable inferences in his favor. See Torisky v. Schweiker, 446 F.3d 438, 442 (3d Cir. 2006).

fact, Yarris was wrong and it was the addict's brother who had died from an overdose. After determining that Yarris's information was incorrect, Martin and Pfeifer returned Yarris to solitary confinement and told him that unless he came up with a better story they would think he had raped and murdered Craig.

After a failed suicide attempt and a brief hospital stay, Yarris was again returned to solitary confinement. Yarris claims that he was placed in a freezing cell with broken windows, without any clothes, sheets, or blankets. Seeking a transfer to a different cell, Yarris offered to share more information about the Craig murder with a prison guard. According to the prison guard, Yarris said that he raped Craig, but that another man murdered her. The day after Yarris's conversation with the guard, Yarris was charged with kidnaping, robbing, raping, and murdering Craig.

Before proceeding to trial for the Craig murder, Yarris was tried and acquitted for the crime for which he was initially arrested and jailed—the attempted murder of a police officer. After the verdict, the prosecutor assigned to the case, assistant district attorney Barry Gross ("Gross"), allegedly slammed his case file against the courtroom wall, screamed at Yarris, "Motherfucker, you'll never leave the county alive!" and spat in Yarris's face.

Yarris subsequently went to trial for the Craig murder, with Gross prosecuting the case. At trial, the prosecution introduced into evidence a photograph of the bloody interior of the victim's car, which showed a pair of men's leather gloves inside the vehicle. The prosecution had never informed Yarris that the gloves existed and, according to Yarris, had determined that the gloves were too small to fit Yarris. Nonetheless, the prosecution led the jury to infer that Yarris's fingerprints were not found in the vehicle because he wore the gloves. In addition to two witnesses who testified that they observed Yarris stalking the victim, the prosecution presented the testimony of Charles Catalino, a jailhouse informant who stated that Yarris confessed his guilt while the two were detained in adjacent cells at the Delaware County prison. Yarris claims the informant testified against him in exchange for a reduced sentence and visits with his wife. On July 1, 1982, the jury found Yarris guilty on all counts and returned a verdict recommending imposition of the death penalty. Yarris was

4

formally sentenced to death on January 24, 1983. The Pennsylvania Supreme Court eventually affirmed Yarris's conviction and sentence in October of 1988.

In March of 1988, Yarris requested testing of the physical evidence recovered from the crime scene using newly developed DNA testing techniques. He was initially informed by the District Attorney's office that all of the relevant evidence had been destroyed, except for two stained slides. The slides were tested, but in August of 1988 the laboratory rejected them as being of insufficient quantity for DNA testing.

After reviewing the transcripts of his criminal trial, Yarris discovered the existence of two additional slides. Yarris contacted the District Attorney's office and assistant district attorney Dennis McAndrews sent two detectives to retrieve the evidence and transport it to the coroner and then to the laboratory. According to Yarris, detectives Pfeifer and John Davidson[2] never delivered the slides to the coroner; instead, they kept the slides in a paper bag under a detective's desk where the slides eventually rotted and were rendered useless for DNA testing. In 1989, additional evidence in the form of the victim's clothing was discovered. Yarris successfully petitioned for DNA testing of this evidence in November of 1989, but the results were inconclusive.

Beginning in 1989, Yarris began to request that evidence be tested again, this time using a newer and more accurate type of DNA testing known as PCR-enhanced DNA testing. The District Attorney eventually agreed to additional testing of the evidence in September 1992, but only if the testing was conducted by the Alabama Department of Forensic Science, which Yarris alleges was not competent in PCR-enhanced DNA testing. The test results were inconclusive.

Yarris eventually sought habeas relief from the United States District Court for the Eastern District of Pennsylvania. In

_____

[2] Davidson died some time after engaging in the conduct alleged in the Amended Complaint and, therefore, is not a defendant in this action.

5

April of 2003, PCR-enhanced DNA testing was performed on the gloves found in the victim's car, and the results indicated that Yarris was not the "habitual user" of the gloves. PCR-enhanced DNA testing was then performed on semen stains found on the victim's clothing, and the results indicated that the sample did not come from Yarris, but did come from two unknown males, one of whom was the "habitual user" of the gloves. PCR-enhanced DNA testing was then done on scrapings found under the victim's fingernails, which revealed that the scrapings were from the "habitual user" of the gloves.

In light of the new evidence, on August 19, 2003, the district court ordered that Yarris be granted a new trial within two weeks, or that Yarris be set free. On August 26, 2003, the District Attorney's office and Yarris's counsel filed a joint petition in the Delaware County Court of Common Pleas requesting that the conviction be vacated. The court vacated Yarris's conviction and sentence on September 3, 2003. After receiving a ninety-day extension to consider whether to re-prosecute Yarris, the District Attorney dropped all charges against Yarris on December 9, 2003. Yarris was released from prison on January 16, 2004.

### B.     Procedural Background

Yarris commenced this action in the United States District Court for the Eastern District of Pennsylvania on August 11, 2004. In his complaint, Yarris named as defendants the County of Delaware; the Office of the District Attorney of Delaware County; the Criminal Investigation Division of the Office of the District Attorney of Delaware County; Assistant District Attorneys Barry Gross, Dennis McAndrews, and William H. Ryan, Jr.; and Criminal Investigation Division Detectives Randolph Martin, Clifton Minshall, David Pfeifer, and Craig Siti. Yarris later filed an Amended Complaint, which contains two causes of action arising out of Yarris's arrest and conviction for murder in 1982: the first for federal constitutional claims, and the second for claims under Pennsylvania law.

The ADAs and CID Detectives moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Amended Complaint on the basis of, among other things, absolute

6

and qualified immunity.  The District Court granted the motion as to Yarris's Fifth Amendment claim against all defendants, and Yarris's claims against Minshall, who is no longer living.  Yarris v. Delaware County, No. 04-cv-3804, 2005 U.S. Dist. LEXIS 4131, at *12-13 (E.D. Pa. Feb. 28, 2005).  However, the District Court denied the motion as to the remainder of Yarris's claims against Assistant District Attorneys Gross, McAndrews, and Ryan (collectively, the "ADAs"), and Criminal Investigation Division Detectives Martin, Pfeifer, and Siti (collectively, the "CID Detectives").  Id.  The ADAs and CID Detectives appealed the District Court's denial of absolute and qualified immunity.

## II.  Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this case involves claims of constitutional violations brought pursuant to 42 U.S.C. § 1983.  The District Court had supplemental jurisdiction over Yarris's state law claims pursuant to 28 U.S.C. § 1367(a).  We have appellate jurisdiction over this interlocutory appeal of the District Court's order denying absolute and qualified immunity from Yarris's constitutional claims to the extent that the order turns on issues of law.  See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).

We exercise plenary review of the legal issues of absolute and qualified immunity.  See Kulwicki v. Dawson, 969 F.2d 1454, 1461 (3d Cir. 1992).  We apply the same standard that district courts apply at the motion-to-dismiss stage, and our review is limited to the contents of the complaint and any attached exhibits.  See id. at 1462.  We are thus concerned with neither the accuracy of the facts alleged nor the merits of Yarris's underlying claims.  We must construe the facts in the manner most favorable to Yarris, in order to determine whether the state officials are entitled to absolute or qualified immunity from any claims based on their alleged conduct.

## III.  Discussion

The ADAs and CID Detectives argue that the District Court should have granted their motion to dismiss because they are immune from each of Yarris's claims against them.  Specifically,

the ADAs contend that they are entitled to either absolute or qualified immunity, and the CID Detectives contend that they are entitled to qualified immunity. We address these arguments in turn.

### A. The Assistant District Attorneys

#### 1. Absolute Immunity From Yarris's Constitutional Claims

Although § 1983 purports to subject "[e]very person" acting under color of state law to liability for depriving any other person in the United States of "rights, privileges, or immunities secured by the Constitution and laws," the Supreme Court has recognized that § 1983 was not meant "to abolish wholesale all common-law immunities." Pierson v. Ray, 386 U.S. 547, 554 (1967). To that end, the Court has identified two kinds of immunities under § 1983: qualified immunity and absolute immunity. Most public officials are entitled only to qualified immunity.[3]  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). However, for public officials who perform "special functions," Butz v. Economou, 438 U.S. 478, 508 (1978), the Court has determined that absolute immunity is appropriate because it is "better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." Imbler v. Pachtman, 424 U.S. 409, 418 (1976) (quotation marks and citation omitted). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns v. Reed, 500 U.S. 478, 486 (1991).

In Imbler, the Supreme Court held that state prosecutors are absolutely immune from liability under § 1983 for actions performed in a quasi-judicial role. See 424 U.S. at 431. This immunity extends to acts that are "intimately associated with the judicial phase of the criminal process," such as "initiating a prosecution and . . . presenting the State's case." Id. at 430-31. The Supreme Court has noted numerous public policy

_____

[3] We discuss qualified immunity in detail in Part III.B of this opinion, infra.

considerations underlying its extension of absolute immunity to prosecutors:

> [S]uits against prosecutors for initiating and conducting prosecutions "could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate"; lawsuits would divert prosecutors' attention and energy away from their important duty of enforcing the criminal law; prosecutors would have more difficulty than other officials in meeting the standards for qualified immunity; and potential liability "would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." . . . [T]here are other checks on prosecutorial misconduct, including the criminal law and professional discipline.

Burns, 500 U.S. at 485-86 (citing Imbler, 424 U.S. at 425, 427-28, 429).

Since extending absolute immunity to state prosecutors in Imbler, the Supreme Court has clarified that absolute immunity does not extend to "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); see also Burns, 500 U.S. at 494-96. At the same time, the Court has reaffirmed that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." Buckley, 509 U.S. at 273.

Ultimately, whether a prosecutor is entitled to absolute immunity depends on whether she establishes that she was functioning as the state's "advocate" while engaging in the alleged conduct that gives rise to the constitutional violation. See id. at 274. As the Supreme Court explained in Kalina v. Fletcher, "in

9

determining immunity, we examine the nature of the function performed, not the identity of the actor who performed it." 522 U.S. 118, 127 (1997) (internal quotation marks, citation, and footnote omitted).

Turning to the instant case, Yarris's Amended Complaint alleges that the ADAs engaged in conduct that violated Yarris's rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[4] In support of these claims, the Amended Complaint alleges that the ADAs deliberately destroyed exculpatory evidence, withheld exculpatory evidence, fabricated a false confession, and obtained a false statement from a jailhouse informant.[5] We analyze whether the ADAs are entitled to absolute immunity from claims based on this alleged conduct below.

a.      Deliberately Destroying Exculpatory Evidence

The Amended Complaint alleges that the ADAs violated Yarris's Fourteenth Amendment rights when they "deliberately destroyed . . . highly exculpatory information."[6] (Am. Compl.

_____

[4] The Amended Complaint also alleges that the ADAs' conduct violated Yarris's Fifth Amendment rights.  As noted above, however, the District Court dismissed that claim, and that ruling is not now on appeal.

[5] In denying absolute immunity to the ADAs, the District Court stated that Yarris alleged that the ADAs "used torture and physical coercion to extract incriminating statements."  As the ADAs point out, however, although the Amended Complaint alleges that the CID Detectives engaged in "torture" (Am. Compl. ¶ 91), there are no allegations that the ADAs did so.  Accordingly, this was not a proper basis on which to deny absolute immunity to the ADAs.

[6] The ADAs argue that "[t]he Complaint does not allege that the ADA Appellants expunged or destroyed investigative notes regarding the black gloves."  (Appellants' Reply Br. at 13.)  We believe, however, that Yarris's assertion that the ADAs deliberately destroyed highly exculpatory information (Am. Compl. ¶ 92), is

10

¶ 92.) Although we have not directly addressed whether prosecutors are absolutely immune from claims based on the destruction of exculpatory evidence, we have denied absolute immunity where a plaintiff alleged that a prosecutor knowingly failed to preserve exculpatory evidence. See Henderson v. Fisher, 631 F.2d 1115, 1120 (3d Cir. 1980) (per curiam). We have also observed that "courts have been unwilling to extend absolute immunity to a prosecutor's alleged perjury or destruction of evidence when not closely connected to an ongoing criminal prosecution." Davis v. Grusemeyer, 996 F.2d 617, 630 n.28 (3d Cir. 1993); but see Heidelberg v. Hammer, 577 F.2d 429, 432 (7th Cir. 1978) (prosecutor absolutely immune from suit claiming that he destroyed and falsified evidence).

We believe that destroying exculpatory evidence is not related to a prosecutor's prosecutorial function. Unlike decisions on whether to withhold evidence from the defense, decisions to destroy evidence are not related to a prosecutor's prosecutorial function. As our late colleague Judge Becker aptly observed in Wilkinson v. Ellis, 484 F. Supp. 1072, 1083 (E.D. Pa. 1980):

> [O]nce the decision is made not to furnish evidence to the defense, no additional protectible prosecutorial discretion is involved in deciding to dispose of it, and . . ., while deciding not to furnish the prosecution's evidence to the defense may be an act of advocacy, throwing the evidence away is not such an act.

Accordingly, the ADAs are not entitled to absolute immunity from suit for constitutional violations caused by their alleged deliberate destruction of exculpatory evidence.

### b. Withholding Exculpatory Evidence

The Amended Complaint next alleges that the ADAs violated Yarris's constitutional rights when they: "withheld highly exculpatory information"; "fail[ed] to disclose investigatory materials and exculpatory evidence"; "fail[ed] to release physical

---

sufficiently detailed at the motion-to-dismiss stage.

evidence for DNA testing in a prompt manner"; and failed "to release exculpatory physical, investigatory, and DNA evidence." (Am. Compl. ¶¶ 92, 93, 96).

It is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity. As the Supreme Court explained in Imbler, the "deliberate withholding of exculpatory information" is included within the "legitimate exercise of prosecutorial discretion." 424 U.S. at 431-32 n.34; see also Smith v. Holtz, 210 F.3d 186, 199 n.18 (3d Cir. 2000). Furthermore, courts have held that prosecutors are entitled to immunity even when they withhold evidence after trial while the criminal conviction is on appeal. See, e.g., Parkinson v. Cozzolino, 238 F.3d 145, 152 (2d Cir. 2001) (explaining that "absolute immunity covers prosecutors' actions after the date of conviction while a direct appeal is pending"). Here, even accepting the allegations concerning the ADAs as true and drawing all reasonable inferences in Yarris's favor, we find that the ADAs are absolutely immune from claims based on allegations that they "intentionally concealed" exculpatory evidence prior to trial. (Am. Compl. ¶¶ 4, 5.) See Imbler, 424 U.S. at 431-32 n.34.

Less clear is whether the ADAs are absolutely immune from claims based on allegations that they withheld exculpatory evidence, in the form of DNA samples, after Yarris was convicted and sentenced to death. (Am. Compl. ¶¶ 93, 96.) We agree with other courts that "[a]bsolute immunity applies to the adversarial acts of prosecutors during post-conviction proceedings . . . where the prosecutor is personally involved . . . and continues his role as an advocate," but that "where the role as advocate has not yet begun . . . or where it has concluded, absolute immunity does not apply." Spurlock v. Thompson, 330 F.3d 791, 799 (6th Cir. 2003). Compare Houston v. Partee, 978 F.2d 362, 366 (7th Cir. 1992) (no absolute immunity where prosecutors were "not personally prosecuting the appeal" in post-conviction proceedings) with Carter v. Burch, 34 F.3d 257, 263 (4th Cir. 1994) (absolute immunity where prosecutor "was handling the postconviction motions and the initial direct appeal . . . [and thus] still functioning as an advocate for the State"). After a conviction is obtained, the

challenged action must be shown by the prosecutor to be part of the prosecutor's continuing personal involvement as the state's advocate in adversarial post-conviction proceedings to be encompassed within that prosecutor's absolute immunity from suit.

Based on the facts on the record as it now stands, the prosecutors have not satisfied their burden of showing that they are entitled to the immunity they seek. Yarris's direct appeal to the Supreme Court of Pennsylvania was argued in April and decided in October of 1988. See Commonwealth v. Yarris, 549 A.2d 513 (Pa. 1988). Yarris's numerous requests for DNA testing of physical evidence began in March 1988—presumably in an attempt to uncover new evidence that might entitle him to extraordinary relief in case the legal avenues he was pursuing did not succeed. The prosecutors have not shown that their response to Yarris's DNA test requests was part of their advocacy for the state in post-conviction proceedings in which they were personally involved.

Without such a showing, a prosecutor acting merely as a custodian of evidence after conviction serves the same non-adversarial function as police officers, medical examiners, and other clerical state employees and—just as with certain police investigative work—"it is neither appropriate nor justifiable that, for the same act, [absolute] immunity should protect the one and not the other[s]." Buckley, 509 U.S. at 273. The handling of requests to conduct scientific tests on evidence made after conviction—not related to grounds claimed in an ongoing adversarial proceeding—can be best described as part of the "prosecutor's administrative duties . . . that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings" and "are not entitled to absolute immunity." Id. Because the ADAs have not yet shown how the handling of DNA evidence related to ongoing adversarial proceedings in which they were personally involved, we conclude that the prosecutors may have been "function[ing] as . . . administrator[s] rather than as . . . officer[s] of the court" and, thus, may be "entitled only to qualified immunity." Id.

      c.  Concocting a False and Fabricated Confession

13

The Amended Complaint next alleges that the ADAs violated Yarris's constitutional rights when they "concoct[ed] a false and fabricated confession." (Am. Compl. ¶ 93.) There is no elaboration in the Amended Complaint regarding the circumstances under which the ADAs fabricated a confession by Yarris. In fact, the only reference to a confession is found in paragraph 40 of the Amended Complaint, which discusses a conversation Yarris had on February 1, 1982, with a prison guard who subsequently "gave a statement and later testified that Yarris said that he had raped Craig, but that another man named Mark had actually murdered her, a statement known to be absolutely false in light of DNA evidence conclusively showing that Yarris was not the rapist." (Am. Compl. ¶ 40.)

Accepting Yarris's allegations as true and drawing all reasonable inferences in his favor, we must conclude that absolute immunity from this claim is not appropriate at the motion-to-dismiss stage. As already noted, the key question is whether the ADAs were functioning as the state's advocates when they engaged in the conduct that gave rise to the evidence-fabrication allegations. See Buckley, 509 U.S. at 274. In Buckley, the Supreme Court denied absolute immunity to prosecutors who had allegedly fabricated evidence that was used to obtain a criminal conviction after it determined that "the prosecutors' conduct occurred well before they could properly claim to be acting as advocates." Id. at 275; see also Kulwicki, 969 F.2d at 1467 (stating that prosecutor who fabricated confession would be absolutely immune if he did so while prosecuting the case). In contrast, the allegations here do not indicate whether the fabrication of Yarris's confession occurred during the preliminary investigation of an unsolved crime, as in Buckley, or after the ADAs had decided to indict Yarris and had begun working as the state's advocates in the prosecution of Yarris. Accordingly, at this stage of the proceedings, the ADAs cannot establish that they are entitled to absolute immunity for allegedly fabricating Yarris's confession.

> d. Obtaining a False Statement from a Jailhouse Informant

The Amended Complaint also alleges that the ADAs violated Yarris's constitutional rights when they "obtain[ed] a false

14

statement from a jailhouse informant." (Am. Compl. ¶ 93.) According to the Amended Complaint, after Yarris was charged with murder, rape, kidnaping, and robbery, he was returned to his prison cell, which was located next to a cell occupied by Charles Catalino, who had been convicted of burglarizing ADA Ryan's home and was awaiting sentencing. (Am. Compl. ¶ 42.) Yarris alleges that the following ensued:

> 43. Charles Catalino subsequently falsely reported, and, perjuring himself, testified at trial, that Yarris expressed concern that his blood would be discovered at the scene of the murder and that he had committed the rape and murder, a statement now known to be absolutely false in light of DNA evidence conclusively showing that Yarris was not the rapist or murderer.

> 44. Yarris believes and therefore avers that Catalino received a reduced sentence on the burglary charge to run concurrent with an existing sentence, was allowed conjugal visits with his spouse, and was released later in 1982.

(Am. Compl. ¶¶ 43-44.) Yarris thus claims that the ADAs used a "'stick and carrot' treatment to elicit [Catalino's] false testimony." (Am. Compl. ¶ 54.)

Based on these allegations, the ADAs are entitled to absolute immunity from Yarris's claim that they obtained a false statement from a jailhouse informant. As a general matter, we note that a prosecutor is absolutely immune from liability for using "false testimony in connection with [a] prosecution." Kulwicki, 969 F.2d at 1465; see also Imbler, 424 U.S. at 430. With respect to the solicitation of false statements alleged here, the ADAs are entitled to absolute immunity to the extent that their conduct occurred while they were acting as advocates rather than investigators. As the Amended Complaint makes clear, Yarris had already been charged with the Craig crimes before Catalino made any statements about what Yarris told him while they were held in adjacent prison cells. (Am. Compl. ¶¶ 41-43.) Thus, although the Amended Complaint does not describe in detail when or how the

15

ADAs "obtain[ed] a false statement from a jailhouse informant" (Am. Compl. ¶ 93), the allegations relating to Catalino's false statements indicate that the ADAs' involvement with Catalino's statements occurred <u>after</u> Yarris's prosecution for those crimes had begun. <u>See</u> <u>Rose v. Bartle</u>, 871 F.2d 331, 344-45 (3d Cir. 1989) (granting absolute immunity where complaint alleged that prosecutors solicited perjured testimony for use in grand jury proceedings); <u>Brawer v. Horowitz</u>, 535 F.2d 830, 832-34 (3d Cir. 1976) (granting absolute immunity where complaint alleged that federal prosecutor and witness conspired to use perjured testimony to secure plaintiffs' convictions). Accordingly, the ADAs are entitled to absolute immunity from this claim.

### 2. Qualified Immunity From Yarris's Constitutional Claims

Prosecutors who are not entitled to absolute immunity from a plaintiff's claims may nonetheless be entitled to qualified immunity from those same claims. <u>See</u> <u>Imbler</u>, 424 U.S. at 430-31. Here, as noted above, the ADAs moved to dismiss Yarris's claims on the basis of both absolute and qualified immunity. The District Court, however, did not consider the ADAs' qualified immunity arguments. Instead, after ruling that the ADAs were not entitled to absolute immunity from any of Yarris's claims, the District Court turned directly to the CID Detectives' qualified immunity arguments without addressing those of the ADAs. For this reason—and with the benefit of our conclusions as to the ADAs' partial entitlement to absolute immunity, <u>supra</u>—we will remand this issue for the District Court to consider in the first instance.

### 3. Absolute Immunity From Yarris's Pennsylvania Law Claims

The Amended Complaint also alleges that the ADAs' actions violated certain of Yarris's rights under Pennsylvania law, which he describes as his "rights to be free from unlawful arrest, malicious prosecution and unlawful incarceration, defamation, assault, battery, negligent and intentional infliction of emotional distress, intimidation, abuse of public trust and public office, breach of fiduciary and governmental trust, invasion of privacy, unlawful restraint, abuse of process, misuse of process, and

16

malicious prosecution, and to due process of law under the Pennsylvania Constitution and laws of the Commonwealth of Pennsylvania." (Am. Compl. ¶ 99.) The ADAs sought dismissal of these claims on the basis of state law immunity.

In denying absolute immunity generally, the District Court did not rule on the ADAs' request for immunity from Yarris's Pennsylvania law claims. Rather, the District Court's analysis focused solely on the ADAs' immunity with respect to the alleged violations of Yarris's rights under the United States Constitution. Because the District Court did not rule on whether the ADAs are immune from Yarris's Pennsylvania law claims, we will remand this issue for consideration by the District Court in the first instance.

### B.     The Criminal Investigation Division Detectives

The Amended Complaint alleges that the CID Detectives also engaged in conduct that violated Yarris's rights under the Fourth, Sixth, Eighth, and Fourteenth Amendments.[7] The CID Detectives moved to dismiss each of Yarris's claims against them on the basis of qualified immunity.

---

[7] Specifically, the Amended Complaint states that the CID Detectives violated Yarris's constitutional rights when they: "used impermissible interrogation techniques including, but not limited to, torture, trickery and deceit, and the suggestion of facts not known to Yarris or other witnesses, to obtain false statements and improper identifications"; "deliberately destroyed and/or withheld highly exculpatory information from [Yarris]"; "concoct[ed] a false and fabricated confession"; "obtain[ed] a false statement from a jailhouse informant"; "fail[ed] to disclose investigatory materials and exculpatory evidence"; and "fail[ed] to release physical evidence for DNA testing in a prompt manner." (Am. Compl. ¶¶ 91, 92, 93.)

In addition, the Amended Complaint alleges that the CID Detectives' conduct violated Yarris's Fifth Amendment rights. As noted above, however, the District Court dismissed that claim, and that ruling is not now on appeal.

17

Qualified immunity shields state officials from suit when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. Courts must undertake a two-step inquiry to determine whether a state official is entitled to qualified immunity. First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right. See Saucier v. Katz, 533 U.S. 194, 201 (2001). If so, the court must then determine whether the constitutional or statutory right allegedly violated by the defendant was "clearly established" at the time the violation occurred. See id. If the court concludes that the defendant's conduct violated a clearly established constitutional or statutory right, it must deny the defendant the protection afforded by qualified immunity. See id.; see also Williams v. Bitner, 455 F.3d 186, 190-91 (3d Cir. 2006).

In denying the motion to dismiss the claims against the CID Detectives, the District Court stated the following:

> Yarris claims the Criminal Investigator Defendants, Martin, Pfeifer and Siti intentionally destroyed evidence by retaining exculpatory DNA evidence in a paper bag under a desk, used impermissible interrogation techniques and coercion to obtain false statements, inflicted serious physical injuries and prosecuted Yarris without probable cause after they determined the killer's gloves would not fit him. If Yarris's claims are true, the Defendants knew their conduct violated Yarris's constitutional rights and they are not entitled to qualified immunity.

Yarris, 2005 U.S. Dist. LEXIS 4131, at *13. On appeal, the CID Detectives argue that the constitutional rights they allegedly violated were not "clearly established" at the time of their conduct. (Appellants' Reply Br. at 13.)

The Amended Complaint alleges that the CID Detectives violated Yarris's Fourteenth Amendment rights when they refused to turn over exculpatory evidence. In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process

18

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). However, "the Brady duty to disclose exculpatory evidence to the defendant applies only to a prosecutor." Gibson v. Superintendent of N.J. Dep't of Law & Public Safety-Div. of State Police, 411 F.3d 427, 442 (3d Cir. 2005). Nonetheless, "police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor." Id. at 443; see also McMillian v. Johnson, 88 F.3d 1554, 1567 (11th Cir. 1996) ("Investigators satisfy their obligations under Brady when they turn exculpatory and impeachment evidence over to the prosecutors."); Walker v. City of New York, 974 F.2d 293, 299 (2d Cir. 1992) ("[T]he police satisfy their obligations under Brady when they turn exculpatory evidence over to the prosecutors.").

The CID Detectives argue that they are entitled to qualified immunity from Yarris's claim that they failed to turn the gloves recovered from the crime scene over to the ADAs prior to trial. We agree. According to the Amended Complaint, before presenting to the jury a photograph depicting a pair of men's gloves inside the victim's vehicle, "[t]he prosecution had already determined . . . after assessing the size of Yarris' hands, that the gloves would not have fit his hands." (Am. Compl. ¶ 56.) Thus, Yarris's own allegations indicate that the CID Detectives had complied with their disclosure duties by giving the gloves to the ADAs prior to trial. Accordingly, the Amended Complaint does not allege a constitutional violation with respect to the pre-trial disclosure of the gloves and, therefore, the CID Detectives are entitled to qualified immunity from this claim.

The CID Detectives also argue that they are entitled to qualified immunity from Yarris's claim that they mishandled and failed to preserve evidence that could be used for DNA testing. The Supreme Court's decision in Arizona v. Youngblood, 488 U.S. 51 (1988), establishes the standard for determining whether law enforcement officials have infringed on a defendant's due process rights by failing to preserve "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." Id. at 57. The Youngblood Court held that "unless a criminal defendant can

19

show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at 57 n.*.

At the outset, we note that Youngblood addresses law enforcement officials' constitutional duty to preserve evidence prior to conviction, whereas Yarris's claim is based on the CID Detectives' post-conviction conduct. We nonetheless believe that the Supreme Court's application of the Due Process Clause in Youngblood guides our analysis here. However, the Youngblood decision did not indicate that it was limited to its temporal context, as it sought to govern applicability of the Due Process Clause in "what might loosely be called the area of constitutionally guaranteed access to evidence" and resolve the violation it described broadly as "the failure of the State to preserve evidentiary material." 488 U.S. at 55, 57. We agree with the reasoning of Judge King of the Fourth Circuit in his concurring opinion in Harvey v. Horan, in which he discussed prisoners' post-conviction due process rights:

> In essence, the concept of due process requires that the government treat its citizens in an evenhanded and neutral manner; thus the targeting of specific individuals with the purpose of frustrating the exercise of their lawful rights contradicts the basic premise of the constitutional guarantee.

> Thus, given that prisoners possess a right of effective access to the court system, a governmental decision to deny access to evidence with the intent—and with the effect—of preventing a prisoner from exercising his right of effective access to the court system would violate due process. To permit a state official to target a particular prisoner and to deliberately frustrate that prisoner's ability to take advantage of post-conviction legal options contravenes the essence of fair and impartial procedural justice.

20

278 F.3d 370, 387 (4th Cir. 2002) (internal citations omitted) (King, J., concurring in part).

The CID Detectives contend that their alleged mishandling of DNA samples does not amount to a constitutional violation because they could not have acted in bad faith insofar as DNA testing was still in its infancy at the time of the alleged violation. We disagree. To establish bad faith, Yarris must allege only that the CID Detectives knew "of the exculpatory value of the evidence at the time it was . . . destroyed." Youngblood, 488 U.S. at 57 n.*. According to the Amended Complaint, CID Detective Pfeifer and another detective "refused to relinquish custody of the evidence, kept the evidence in a paper bag, in a non-controlled environment, under a detective's desk, where it was allowed to rot and to be destroyed as useful evidence." (Am. Compl. ¶ 70.) These allegations indicate that the CID Detectives consciously acted to frustrate Yarris's request for DNA testing; therefore, the Amended Complaint's allegations concerning the CID Detectives' conduct satisfy Youngblood's bad faith requirement. See id. at 58 (explaining that due process is violated when "the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant").

Furthermore, we find that the due process right at issue here was "clearly established" at the time of the alleged violation. The Supreme Court decided Youngblood on November 29, 1988. Although the Amended Complaint does not indicate precisely when the evidence was hidden under a desk and allowed to rot, the sequence of the allegations suggests that the conduct occurred between some time in 1988 and November of 1989. (See Am. Compl. ¶¶ 68-72.) Thus, accepting Yarris's allegations as true and drawing all reasonable inferences in his favor, we conclude that even though DNA testing may have been less common at the time of the alleged mishandling of evidence, the CID Detectives were given fair warning that their conduct was unconstitutional.[8]

---

[8] We note that even if the CID Detectives' alleged conduct occurred prior to Youngblood, the constitutional right at issue nonetheless may have been clearly established. See Hope v. Pelzer, 536 U.S. 730, 741 (2002) (explaining that in some cases "a

21

Accordingly, the CID Detectives are not entitled to qualified immunity from this claim at this stage of the proceedings.

Yarris also alleges that the CID Detectives violated his constitutional rights by using trickery or deceit to obtain false evidence against him. As noted, the introduction in evidence of the allegedly false testimony was the work of prosecutors—not the CID Detectives—and is covered by absolute prosecutorial immunity. Michaels v. New Jersey, 222 F.3d 118, 121-22 (3d Cir. 2000). We perceive no support—and Yarris has identified no support—for the proposition that the use of impermissible interrogation techniques in securing statements prior to their use in court constituted an independent violation of Yarris's constitutional rights. See Chavez v. Martinez, 538 U.S. 760 (2003); Michaels v. New Jersey, 222 F.3d 118 (3d Cir. 2000); Buckley v. Fitzsimmons, 20 F.3d 789 (7th Cir. 1994). In the absence of such a violation, the CID Detectives are entitled to qualified immunity with respect to these claims.

## IV. Conclusion

For the foregoing reasons, the order of the District Court will be affirmed in part, reversed in part, and this case will be remanded for further proceedings consistent with this opinion.

general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful") (internal quotation marks and citations omitted).

22