

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-2007

# Burella v. Philadelphia

Precedential or Non-Precedential: Precedential

Docket No. 04-1157

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Burella v. Philadelphia" (2007). *2007 Decisions.* Paper 343.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/343

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 04-1157/2495

———

JILL BURELLA, individually and as parent and guardian of
BETH ANN BURELLA, DANIELLE BURELLA, and
NICHOLAS BURELLA

v.

CITY OF PHILADELPHIA; ROBERT REAMER, individually
and as a police officer of the City of Philadelphia; WARREN
ZALUT; CHARLES BLOOM, individually and as a police
officer of the City of Philadelphia; FRANCIS GRAMLICH,
individually and as a police officer of the City of Philadelphia;
JOHN DOE I, individually and as a police officer of the City of
Philadelphia; JOHN DOE II, individually and as a police officer
of the City of Philadelphia; JOHN DOE III, individually and as a
police officer of the City of Philadelphia; JOHN DOE IV,
individually and as a police officer of the City of Philadelphia

Robert Reamer, Charles Bloom, Francis Gramlich,
                                        Appellants.

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 00-cv-00884)
District Judge: Honorable Herbert J. Hutton

———

Argued November 2, 2006

Before: AMBRO, FUENTES and SMITH, Circuit Judges

(Filed: September 13, 2007 )

Ralph J. Kelly (Argued)
McShea & Tecce
Bell Atlantic Tower
1717 Arch Street, 28th floor
Philadelphia, PA 19103

      Counsel for Appellees


Craig R. Gottlieb (Argued)
City of Philadelphia Law Department
1515 Arch Street
One Parkway
Philadelphia, PA 19102

      Counsel for Appellants

————

OPINION OF THE COURT

————

FUENTES, Circuit Judge.

In January 1999, George Burella, a ten-year veteran of the Philadelphia Police Department, shot and seriously injured his wife, Jill Burella, and then shot and killed himself.[1] George Burella had emotionally and physically abused Jill Burella for years prior to the shooting. Although she reported numerous incidents of abuse to the police over the years, obtained several restraining orders just days before the shooting, and told police that her husband continued threatening her despite the orders, police failed to arrest him. This appeal concerns whether the police officers had

---

[1] At the time of the shooting, Jill and George Burella had three young children—an eleven-year-old daughter, Bethann, and six-year-old twins, Nicholas and Danielle. Jill Burella brings this lawsuit individually and on her children's behalf.

a constitutional obligation to protect Jill Burella from her husband's abuse. Despite our grave concerns about the Philadelphia Police Department's alleged conduct in this case, we hold that the officers did not have such an obligation. Accordingly, we will reverse the District Court's denial of qualified immunity and remand for further proceedings consistent with this opinion.

## I. Background[2]

We set forth in some detail the long and protracted history of physical and emotional abuse in this case because it is central to Jill Burella's claim that Philadelphia police officers knew about the abuse, but nevertheless failed to act, thereby violating her due process and equal protection rights.

The abuse began around February 1996, when George Burella was convicted of disorderly conduct for stalking his wife at her workplace and assaulting her male co-worker who he suspected was having an affair with her. One month later, in the face of marital troubles and a severe gambling problem, George Burella attempted suicide. He survived and was admitted to a psychiatric hospital where he was diagnosed with depression.

After her husband was released from the hospital, Jill Burella contacted the Philadelphia Police Department's Employee Assistance Program ("EAP"), which is designed to assist officers in obtaining help with personal problems. The EAP notified the City Medical Department, which placed George Burella on restricted duty and referred him to City doctors for psychological treatment. The doctors eventually cleared him to return to full active duty in August 1996, provided he be evaluated every four months for a period of one year. Jill Burella alleges that the City

---

[2] "In interlocutory appeals from denials of summary judgment on the basis of qualified immunity, we must accept the District Court's set of facts as given." Walker v. Horn, 286 F.3d 705, 707 (3d Cir. 2002). The District Court's opinion is set forth in Burella v. City of Philadelphia, No. Civ. 00-884, 2003 WL 23469295 (E.D. Pa. Dec. 17, 2003).

did not follow up.

George Burella's violence towards his wife continued over the next several years and, in early June 1998, she contacted the Philadelphia Police Department's Internal Affairs Division to report the abuse. Internal Affairs referred the matter to the EAP, which assigned George Burella a peer counselor.

Later that month, on June 26, 1998, George Burella assaulted his wife and another man at a local bar. Witnesses called 911, but George Burella left the bar before police officers arrived. When he got home, he phoned his wife and threatened to shoot their son Nicholas if she did not immediately return to the house. After calling 911, Jill Burella rushed home, where her husband, who was armed with a gun, threatened to shoot her. Before the matter worsened, police officers arrived. George Burella initially refused the officers' order to surrender, but did so after the officer in charge agreed to report the incident as a domestic disturbance, rather than a more serious offense. Officer Robert Reamer, who is named as a defendant in this lawsuit, was one of the officers who arrived at the scene.

After the police officers left, George Burella began beating his wife on their front lawn. Her parents arrived and took her to their house, but George Burella followed them there. Once at her parents' house, she tried to call 911, but her husband wrestled the phone from her and told the operator that he was a police officer and that everything was under control. As a result, the operator did not instruct police to respond to the situation. Three days later, Jill Burella contacted the EAP to report the incident, but because the EAP failed to notify Internal Affairs, the incident was never investigated.

In July 1998, George Burella called his wife at work in Upper Southampton Township and threatened to kill her. After Upper Southampton police officers arrived at her workplace, she received several more threatening phone calls from her husband. The officers called Captain Charles Bloom, George Burella's commanding officer, and a defendant in this lawsuit, to inform him about the incident.

4

Captain Bloom became directly involved in the situation on August 13, 1998, when Northampton police officers arrested George Burella for assaulting Jill Burella in Bucks County. The officers released George Burella into the custody of Captain Bloom, who escorted him home. Three days later, on August 16, George Burella called his wife while she was visiting his parents with the children and again threatened to kill her. When he went to his parents' house, Northampton police officers responding to an emergency call escorted him to his car, unloaded his firearm, and placed it in the trunk of the car. Shortly thereafter, officers found him driving in the vicinity of the house with his gun re-loaded and placed on the backseat of his car. Officers took him to a local hospital, but he was released shortly thereafter.[3] After being notified of the incident, Captain Bloom ordered George Burella to submit to a psychiatric evaluation.

Later that month, George Burella admitted himself to a psychiatric hospital, but left after four days of treatment. Several days later, City psychologists examined him and concluded that he should be monitored for the next two years. After one follow-up appointment with City doctors in September 1998, he did not return for treatment.

On December 24, 1998, George Burella again assaulted his wife, this time while she was visiting a friend. When Philadelphia police officers arrived, they allowed him to leave with the couple's youngest daughter, and then took Jill Burella and her two other children home, where her husband resumed beating her.

Over the course of the next few weeks, Jill Burella obtained the three protection from abuse orders relevant to this lawsuit. On

---

[3] The District Court's opinion states that Jill Burella went with her father-in-law to obtain an order of protection after she received the threatening phone calls on August 16, 1998. Although the record is unclear, it seems that George Burella's father and half-sister may have also obtained orders of protection, and that officers served him with all three orders of protection at the hospital. (See App. at 748-59.)

5

January 2, 1999, she obtained an emergency ex parte protection from abuse order from the Philadelphia Court of Common Pleas that prohibited her husband from "abusing, harassing, stalking and/or threatening" her, and from "living at, entering, attempting to enter or visiting" the couple's home. The order further provided that officers "shall . . . arrest the defendant if he/she fails to comply with this Order." (App. at 110-11.) The next day, Officer Reamer served the order on George Burella, who, according to Jill Burella, immediately violated it by shouting at and threatening her. Despite witnessing the alleged violation, Officer Reamer permitted George Burella to enter the house.

The next day, Jill Burella obtained another temporary protection from abuse order, which essentially repeated the terms set forth in the January 2 order. In addition, the court awarded her temporary custody of the couple's three children, prohibited George Burella from having "any contact" with her, and ordered him to relinquish all guns other than his service weapon, which he was required to turn over to his commanding officer at the end of every shift. The order also stated that "[t]his Order shall be enforced by any law enforcement agency in a county where a violation of this Order occurs." (App. at 121-22.)

Later that day, Jill Burella called 911 after she received threatening phone calls from her husband. After officers arrived, and while in their presence, she received several more calls from her husband. The officers told her they could not do anything unless her husband was physically present.[4] When Jill Burella called the police the next day, again they told her that nothing could be done unless her husband was physically present at her house.

On January 8, 1999, Jill Burella obtained a final order of protection.[5] Four days later, following an appointment with a

---

[4] It is unclear, according to the District Court, whether the officers knew that there was a protection from abuse order in effect.

[5] The District Court noted that the provision in the final order requiring Officer Burella to relinquish his weapons was crossed

psychiatrist at the City Medical Department, George Burella went to the house he formerly shared with his wife and shot her in the chest. He then immediately shot and killed himself. Although she suffered serious injuries, Jill Burella survived the shooting.

In February 2000, Jill Burella filed a complaint in Pennsylvania state court against Officer Reamer, Captain Bloom, and Captain Bloom's successor, Francis Gramlich, along with the City of Philadelphia and Dr. Warren Zalut, the City psychiatrist who saw George Burella on the day of the shooting. After the case was removed to federal district court, she filed an eight-count amended complaint asserting various federal constitutional and state law claims. The officers and the City moved for summary judgment on all counts asserted against them.[6] This appeal concerns solely the District Court's summary judgment ruling that the officers are not entitled to qualified immunity with respect to Jill Burella's due process (Count I) and equal protection (Count IV) claims.[7]

## II. Jurisdiction and Standard of Review

The District Court had subject matter jurisdiction over plaintiff's federal constitutional claims pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over her state law claims pursuant to § 1367(a). Under the collateral order doctrine,

_____

out. Burella, 2003 WL 23469295, at *8 n.6.

[6] Count VIII of the amended complaint set forth a negligence claim against Dr. Zalut, who was not a party to the summary judgment motion. Burella, 2003 WL 23469295, at *3 n.2.

[7] The District Court denied the officers' motion for reconsideration. We note that in its summary judgment ruling, the District Court also allowed Jill Burella to proceed against the officers on a state equal protection claim and a claim for intentional infliction of emotional distress. Burella, 2003 WL 23469295, at *13-14. In addition, the District Court denied the City of Philadelphia summary judgment on all claims asserted against it. Id. at *9-12.

we have appellate jurisdiction over an interlocutory appeal of a district court's order denying qualified immunity to the extent the denial turns on issues of law. See Yarris v. County of Delaware, 465 F.3d 129, 134 (3d Cir. 2006). We exercise plenary review over legal issues related to qualified immunity. Id.

## III.  Legal Framework

"Section 1983, enacted as part of the Civil Rights Act of 1871, establishes 'a federal remedy against a person who, acting under color of state law, deprives another of constitutional rights.'"[8] McCurdy v. Dodd, 352 F.3d 820, 825 (3d Cir. 2003) (quoting City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 258 (1981)). In order to establish a prima facie case under § 1983, a plaintiff must demonstrate that: "(1) a person deprived [her] of a federal right; and (2) the person who deprived [her] of that right acted under state or territorial law." Groman v. Twp. of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). The parties agree that the officers are state actors for purposes of this § 1983 lawsuit, but dispute whether Jill Burella was deprived of a federal constitutional right.

Even when a federal right is implicated in a § 1983 action, a state actor alleged to have violated that right may nevertheless be entitled to qualified immunity from suit. "Qualified immunity shields state officials from suit when their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Yarris, 465 F.3d at 140

_____

[8] Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2003).

(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Thus, in order to decide whether a defendant is entitled to qualified immunity, a court must first determine if, assuming the facts alleged in the complaint are true, defendant's conduct violated a constitutional or statutory right and, if so, whether the right allegedly violated was "clearly established" at the time of the violation. Id. If the court concludes that the defendant's conduct violated a clearly established right, it must deny the defendant the protection afforded by qualified immunity.[9] Id.

## IV. Analysis

The officers contend that Jill Burella did not have a constitutional right to police protection from her husband's abuse and, even if she did, that such a right was not clearly established at the time of the alleged violation. Therefore, the officers argue, the District Court erred when it denied them qualified immunity with respect to her due process claim.[10] In addition, they argue that the District Court erred in ruling that she had a cognizable federal equal protection claim sufficient to overcome their qualified immunity. We address the District Court's due process and equal

---

[9] The Supreme Court has explained that the doctrine of qualified immunity is an attempt to balance "not only the importance of a damages remedy to protect the rights of citizens, but also the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow, 457 U.S. at 807 (citation and internal quotation marks omitted).

[10] The District Court held that Captain Bloom (but not Officer Reamer or Captain Gramlich) was entitled to qualified immunity from Jill Burella's due process claim because Jill Burella did not allege any facts "to show that Captain Bloom failed to protect [her] once the first protection from abuse order was issued on January 2, 1999." Burella, 2003 WL 23469295, at *9. For sake of convenience, we refer to "the officers" collectively throughout our discussion, with the understanding that only Officer Reamer and Captain Gramlich challenge the District Court's due process qualified immunity ruling.

9

protection rulings in turn.

## A. Due Process

Although the District Court ruled that Jill Burella did not have a viable substantive due process claim, it held that she had a procedural due process right to police protection based on the Pennsylvania Protection from Abuse Act and the protection from abuse orders issued by the Pennsylvania Court of Common Pleas. For the reasons that follow, we do not agree that Jill Burella had a constitutional right to police protection.

### 1) *Substantive Due Process*

The District Court correctly determined that DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989), forecloses Jill Burella from asserting a substantive due process claim. The victim in DeShaney, Joshua DeShaney, was brutally and repeatedly beaten by his father. County social workers were aware of the abuse, took some steps to intervene, but decided not to permanently remove Joshua from his father's custody. After suffering permanent brain damage at the age of four as a result of the abuse, Joshua and his mother, as guardian ad litem, brought a § 1983 action alleging that county social workers "deprived Joshua of his liberty without due process of law . . . by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." Id. at 193.

The Supreme Court rejected plaintiffs' substantive due process argument, explaining that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Rather, the Court observed, "[t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." Id. at 195. Therefore, the Court reasoned, "[i]f the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." Id. at 196-97.

The Supreme Court also rejected plaintiffs' argument that once the State took steps to intervene in the abuse, it was obligated to do so in a reasonably competent manner. The Court explained that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 200. In other words:

> it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to protect his liberty interests against harms inflicted by other means.

Id.

Recognizing that Jill Burella does not have a viable substantive due process claim under DeShaney, the District Court turned to whether she had a procedural due process right to police protection.

2)      *Procedural Due Process*

The District Court held that Jill Burella had a procedural due process claim under Board of Regents v. Roth, 408 U.S. 564 (1972). In Roth, plaintiff was a non-tenured professor at a state university who was not rehired after his term of employment expired. Plaintiff argued that "the failure of University officials to give him notice of any reason for nonretention and an opportunity for a hearing violated his right to procedural due process of law." Id. at 569.

In rejecting plaintiff's argument, the Supreme Court stated that:

11

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount. But the range of interests protected by procedural due process is not infinite.

Id. at 569-70 (footnote omitted). With respect to how such interests are created, the Court explained: "Property interests are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id. at 577.

Thus, the Court observed, it had previously recognized the existence of a constitutionally protected property interest in cases involving, for example, "a person receiving welfare benefits under statutory and administrative standards defining eligibility for them," id. at 576 (citing Goldberg v. Kelly, 397 U.S. 254 (1970); Flemming v. Nestor, 363 U.S. 603 (1960)); "a public college professor dismissed from an office held under tenure provisions," id. (citing Slochower v. Bd. of Higher Educ., 350 U.S. 551 (1956)); and "college professors and staff members dismissed during the terms of their contracts," id. at 577 (citing Wieman v. Updegraff, 344 U.S. 183 (1952)).

The Supreme Court concluded that the plaintiff in Roth could not point to any source that would support his claim that he had a property interest in continued employment:

[T]he terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract

12

concern in being rehired, but he did not have a property interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment.

Id. at 578 (footnote omitted).

Recognizing the absence of any Third Circuit procedural due process cases squarely applicable to the facts presented in this case, the District Court relied principally on Coffman v. Wilson Police Department, 739 F. Supp. 257 (E.D. Pa. 1990), another tragic domestic violence case in which the police failed to enforce a protection from abuse order obtained by the victim pursuant to the Pennsylvania Protection from Abuse Act. The district court held there that the victim had a constitutionally protected entitlement to police protection because, in the court's view, the order required officers to arrest the abuser:

> An order of court, served upon the Department, that states that the Department shall enforce the order is unambiguous. The word "shall" is mandatory, not precatory, and its use in a simple declarative sentence brooks no contrary interpretation. Although, in the context of Roth, property interests generally arise from sources other than judicial orders, it is in no way remarkable that an order could create such an entitlement.

Id. at 264.

In this case, the District Court found the reasoning in Coffman persuasive:

> [T]he Philadelphia Court of Common Pleas issued protection from abuse orders pursuant to the [Pennsylvania Protection from Abuse Act] on behalf of Jill Burella. The orders, issued on January 2, 4, and 8, 1999, were each served on Officer George Burella by the Philadelphia Police Department. According to the reasoning set forth in Coffman

13

under very similar facts, the [protection from abuse] orders alone may be sufficient to afford [Jill Burella] an entitlement to police protection from her husband.

Burella, 2003 WL 23469295, at *6.

In addition, in the District Court's view, changes to the Pennsylvania Protection from Abuse Act enacted in 1994 further supported Jill Burella's procedural due process claim. Where previously the Act stated that "[a]n arrest for violation of an order issued pursuant to this chapter may be without warrant upon probable cause whether or not the violation is committed in the presence of the police officer," 23 Pa. Cons. Stat. Ann. § 6113 (1990), in 1994, the Pennsylvania Legislature amended the Act to provide that "[a] police officer or sheriff *shall arrest* a defendant for violating an order issued under this chapter." 23 Pa. Cons. Stat. Ann. § 6113(a) (2003) (emphasis added). Thus, in the District Court's view, "[u]nder the new language, once the order is violated, the statute is clear; the police 'shall arrest.'" Burella, 2003 WL 23469295, at *7. Therefore, the District Court reasoned, the orders of protection, coupled with the Pennsylvania statute, left officers without discretion not to arrest George Burella for a violation and, thereby, conferred on Jill Burella an entitlement to police enforcement of the orders.

After the parties briefed this appeal, the Supreme Court addressed a similar procedural due process claim in Town of Castle Rock v. Gonzales, 545 U.S. 748 (2005).[11] In Castle Rock, the plaintiff obtained an order of protection that commanded her husband "not to molest or disturb the peace of [plaintiff] or of any child and to remain at least 100 yards from the family home at all times." Id. at 751 (internal quotation marks omitted). Plaintiff's husband abducted the couple's three young daughters, and despite plaintiff's repeated calls for help, police failed to respond. The husband ultimately murdered the children and was then killed in a

---

[11] In response to this Court's instructions, the parties submitted supplemental briefing and further addressed the case at oral argument.

14

shoot-out with police. Plaintiff sued the City of Castle Rock, along with the officers who handled her calls, for failing to enforce the order of protection.

Reversing an en banc decision of the United States Court of Appeals for the Tenth Circuit, the Supreme Court, in a 7-2 decision, rejected the argument that the victim had a constitutionally protected property interest in police enforcement of the order of protection.[12] The Court began its analysis by explaining that DeShaney left open the question whether a victim of a private act of violence may, under certain circumstances, have a constitutionally cognizable property interest in police protection. Id. at 755. Turning to the victim's procedural due process claim, the Supreme Court first looked at the terms of the order of protection. A preprinted warning on the back of the order provided:

> A KNOWING VIOLATION OF A RESTRAINING ORDER IS A CRIME . . . A VIOLATION WILL ALSO CONSTITUTE CONTEMPT OF COURT. YOU **MAY BE ARRESTED** WITHOUT NOTICE IF A LAW ENFORCEMENT OFFICER HAS PROBABLE CAUSE TO BELIEVE THAT YOU HAVE KNOWINGLY VIOLATED THIS ORDER.

Id. at 752. Additional preprinted text on the back of the order set forth a "**NOTICE TO LAW ENFORCEMENT OFFICIALS**" which stated:

> YOU SHALL USE EVERY REASONABLE

---

[12] Although the Tenth Circuit held that plaintiff had a procedural due process right to police enforcement of the order of protection, it concluded that the officers were entitled to qualified immunity because the right was not clearly established at the time of the alleged violation. Gonzales v. City of Castle Rock, 366 F.3d 1093, 1117-18, *rev'd*, 545 U.S. 748 (2005). Therefore, even under the Tenth Circuit's ruling, plaintiff could only have proceeded against the City on her procedural due process claim.

MEANS TO ENFORCE THIS RESTRAINING ORDER. YOU SHALL ARREST, OR, IF AN ARREST WOULD BE IMPRACTICAL UNDER THE CIRCUMSTANCES, SEEK A WARRANT FOR THE ARREST OF THE RESTRAINED PERSON WHEN YOU HAVE INFORMATION AMOUNTING TO PROBABLE CAUSE THAT THE RESTRAINED PERSON HAS VIOLATED OR ATTEMPTED TO VIOLATE ANY PROVISION OF THIS ORDER . . . .

Id. The Court then observed that the Notice "effectively restated the [Colorado] statutory provision describing 'peace officer's duties' related to the crime of violation of a restraining order." Id. at 758. That provision stated, in relevant part:

> (a) . . . *A peace officer shall use every reasonable means to enforce a restraining order.*
> (b) *A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person* when the peace officer has information amounting to probable cause . . . .
> (c) . . . *A peace officer shall enforce a valid restraining order whether or not there is a record of the restraining order in the registry.*

Id. at 758-59 (emphasis added by Castle Rock) (quoting Colo. Rev. Stat. § 18-6-803.5(3) (1999)). The Supreme Court rejected the Court of Appeals' conclusion that

> this statutory provision—especially taken in conjunction with a statement from its legislative history, and with another statute restricting criminal and civil liability for officers making arrests—established the Colorado Legislature's clear intent to alter the fact that the police were not enforcing domestic abuse restraining orders, and thus its intent that the recipient of a domestic abuse restraining order have an entitlement to its

16

enforcement.

Id. 759-60 (footnotes and internal quotation marks omitted).

Focusing on the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands," id. at 761, the Supreme Court stated that it did "not believe that these provisions of Colorado law truly made enforcement of restraining orders *mandatory*." Id. at 760. Rather, the Court observed, "[a] well-established tradition of police discretion has long coexisted with apparently mandatory arrest statutes." Id. Given this tradition, "a true mandate of police action would require some stronger indication from the Colorado Legislature than 'shall use every reasonable means to enforce a restraining order' (*or even 'shall arrest* . . . or . . . seek a warrant')." Id. (emphasis added). As the Court explained:

> It is hard to imagine that a Colorado police officer would not have some discretion to determine that—despite probable cause to believe a restraining order has been violated—the circumstances of the violation or the competing duties of that officer or his agency counsel decisively against enforcement in a particular instance.

Id. at 761. The Court stated, for example, that a police officer might properly choose "not to enforce a restraining order when the officer deems a technical violation too immaterial to justify arrest." Id. at 762 n.8 (internal quotation marks omitted).

Moreover, the Court noted, even if the statute could be construed as having made enforcement of the restraining order "mandatory," "that would not necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate." Id. at 764-65. Rather, "[m]aking the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people." Id. at 765. The Court observed, for example, that criminal statutes often serve public rather than private ends, as reflected by the discretion afforded a Colorado district attorney to pursue criminal prosecution

17

under the statute even if the victim withdraws his or her complaint. Id. Moreover, "[t]he protected person's express power to 'initiate' civil contempt proceedings contrasts tellingly with the mere ability to 'request' initiation of criminal contempt proceedings—and even more dramatically with the complete silence about any power to 'request' (much less demand) that an arrest be made." Id. at 766.

Finally, the Court pointed out that even if it were to conclude that the Colorado statute created an entitlement to enforcement of a restraining order, "it is by no means clear that [such an entitlement] could constitute a 'property' interest for purposes of the Due Process Clause." Id. That is, "[s]uch a right would not, of course, resemble any traditional conception of property."[13] Id.

Thus, the Court held, "[i]n light of today's decision and that in DeShaney, the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process clause, neither in its procedural nor its 'substantive' manifestations." Id. at 768.

Jill Burella argues that the Supreme Court's decision in Castle Rock does not prevent her from succeeding on her procedural due process claim because the Pennsylvania Protection from Abuse Act states that police "*shall arrest* a defendant for violating an order." See 23 Pa. Cons. Stat. Ann. § 6113(a) (emphasis added). It does not, as the Colorado statute provides, state that police "*shall use every reasonable means* to enforce" the restraining order. See Colo. Rev. Stat § 18-6-803.5(3) (emphasis added). Therefore, she contends, under the Pennsylvania statute, police officers do not have discretion not to enforce a protection from abuse order.

---

[13] "Perhaps most radically," the Court observed, "the alleged property interest here arises *incidentally*, not out of some new species of government benefit or service, but out of a function that government actors have always performed—to wit, arresting people who they have probable cause to believe have committed a criminal offense." Id. at 766-67.

18

As discussed above, however, the Court in Castle Rock unambiguously stated that absent a "clear indication" of legislative intent, a statute's mandatory arrest language should not be read to strip law enforcement of the discretion they have traditionally had in deciding whether to make an arrest. 545 U.S. at 761. Although the Supreme Court did not specify what language would suffice to strip the police of such discretion, it is clear after Castle Rock that the phrase "shall arrest" is insufficient. As previously noted, the Supreme Court explicitly stated that "a true mandate of police action would require some stronger indication from the Colorado Legislature than . . . 'shall arrest.'" Id.

In addition, we note that Jill Burella's argument fails to address the Supreme Court's observation in Castle Rock that even if the Colorado domestic violence statute mandated an arrest, it would not necessarily mean the victim would have an "entitlement" to an arrest. That is, although the Pennsylvania statute allows a victim of domestic violence to "file a private criminal complaint against a defendant, alleging indirect criminal contempt" for violation of a protective order, 23 Pa. Cons. Stat. § 6113.1(a), or "petition for civil contempt" against the violator, 23 Pa. Cons. Stat. § 6114.1(a), like the Colorado statute, it is silent as to whether a victim can request, much less demand, an arrest.[14] See 23 Pa. Cons. Stat. Ann. § 6113:1(a). In fact, "[w]hen an individual files a private criminal complaint [under § 6113.1], the district attorney has the discretion to refrain from proceeding for policy reasons." Starr v. Price, 385 F. Supp. 2d 502, 511 (M.D. Pa. 2005); Pa. R. Crim. P. 506.

Moreover, Jill Burella's attempt to limit the Supreme Court's holding in Castle Rock to situations in which the abuser is not present at the time of the alleged violation is unconvincing. She is correct that the Supreme Court stated that "[t]he practical

---

[14] We acknowledge that in allowing a domestic violence victim to initiate criminal contempt proceedings, the Pennsylvania statute goes further than the Colorado statute, which only allowed a victim of domestic violence to request that the State initiate such proceedings.

19

necessity for [police] discretion is particularly apparent in a case such as this one, where the suspected violator is not actually present and his whereabouts are unknown." Id. at 762. But, in our view, the Court's holding in Castle Rock did not depend on the absence of the perpetrator. Indeed, we agree with the officers that the perpetrator's absence "was only additional fodder for discretion, not a necessary ingredient." (See Appellants' Suppl. Letter Br. at 3.)

Finally, we cannot ignore that despite framing the issue as one of procedural due process, what Jill Burella appears to seek is a substantive due process remedy: that is, the right to an arrest itself, and not the pre-deprivation notice and hearing that are the hallmarks of a procedural due process claim.

In short, whether framed as a substantive due process right under DeShaney, or a procedural due process right under Roth, Jill Burella does not have a cognizable claim that the officers' failure to enforce the orders of protection violated her due process rights.[15] Therefore, we need not determine whether her entitlement to police protection was "clearly established" at the time of the alleged violation before concluding that the officers are entitled to qualified immunity.

3)    *State-Created Danger*

We also conclude that Jill Burella cannot succeed on her state-created danger claim because she fails to allege any facts that would show that the officers *affirmatively* exercised their authority in a way that rendered her more vulnerable to her husband's abuse.[16]

_____

[15] We note that at least one Pennsylvania district court has recognized that Coffman, which the District Court relied on in this case, is no longer good law in light of Castle Rock. See Starr, 385 F. Supp. 2d at 502.

[16] Although the District Court did not evaluate Jill Burella's state-created danger claim because it had already decided that she possessed a Roth entitlement to police protection, Burella, 2003

20

We have described the state-created danger doctrine as "a complement to the DeShaney holding." Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006). The doctrine recognizes that a constitutional violation may result "when state authority is affirmatively employed in a manner that injures a citizen or renders him more vulnerable to injury from another source than he or she would have been in the absence of state intervention."[17] Id.

_____

WL 23469295, at *7 n.4, we think the record is sufficiently developed in this case to allow us to address the issue. See In re Ben Franklin Hotel Assocs., 186 F.3d 301, 306 (3d Cir. 1999) ("Because the record has been sufficiently developed for us to resolve this legal issue, we need not remand to the District Court to consider it in the first instance."); see also Hudson United Bank v. Litenda Mortgage Corp., 142 F.3d 151, 159 (3d Cir. 1998) ("This procedure is generally appropriate when the factual record is developed and the issues provide purely legal questions, upon which an appellate court exercises plenary review."). Moreover, we note that in her brief on appeal, Jill Burella does not ask that we remand the issue to the District Court, but rather, thoroughly argues the merits of her claim. (See Appellant's Br. at 48-66.)

[17] We have held that there are four elements of a state-created danger claim: (1) "the harm ultimately caused was foreseeable and fairly direct," (2) "a state actor acted with a degree of culpability that shocks the conscience," (3) "a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions as opposed to a member of the public in general;" and (4) *"a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all."* Bright, 443 F.3d at 281 (emphasis added) (internal quotation marks omitted). We first recognized a viable state-created danger claim in Kneipp v. Tedder, 95 F.3d 1199, 1211 (3d Cir. 1996), a case in which the plaintiff suffered severe injuries after police stopped her on her way home with her husband while she was in an obvious state of inebriation, told the husband that he should go home and that they would take care of plaintiff, and then abandoned plaintiff

21

(internal quotation marks omitted) (emphasis added).

Jill Burella contends that the officers' "continual refusal to enforce the court order and follow state law requiring Officer Burella's arrest, together with their false direction that 'there was nothing they could do,' as well as overall inadequate intervention were affirmative acts which together increased the likelihood of harm." (Appellee's Br. at 50.) Her attempt to characterize the officers' alleged wrongdoing as an affirmative misuse of authority is not persuasive. Rather, it is apparent that what she actually contends is that the officers failed to act at all. We agree with the officers that this argument is deficient as a matter of law. See Ye v. United States, 484 F.3d 634, 638 (3d Cir. 2007) ("[B]oth DeShaney and [Third Circuit] precedents explicitly require[] an affirmative act, rather than inaction.").

For example, in Bright, we addressed a claim brought on behalf of Annette Bright, an eight-year-old girl murdered by a man who was released on parole for an earlier sex offense involving Annette's twelve-year-old sister. The perpetrator repeatedly violated his parole by attempting to carry on a relationship with the victim. The girls' father called the police and was assured that the perpetrator's parole would be revoked. Before the parole revocation hearing, however, the perpetrator murdered Annette in retaliation against her family for trying to prevent him from seeing Annette's sister. 443 F.3d at 278-79.

Annette's father, suing on her behalf, argued that the police caused Annette's death by (1) delaying the revocation of parole; (2) assuring Annette's family that they would protect Annette, but then failing to do so; and (3) not following up on a confrontation with the perpetrator prior to Annette's murder, thereby "embolden[ing] him to commit a crime he otherwise would not have committed." Id. at 283. We rejected this argument on grounds that:

---

on the side of the road, at which point plaintiff sustained her injuries.

22

> The reality of the situation . . . is that what is alleged to have created a danger was the failure of the defendants to utilize their state authority, not their utilization of it. [Plaintiff] has identified no action of the defendants that utilized their state authority in a manner that rendered Annette more vulnerable . . . than she would otherwise have been.

Id. at 284. As in Bright, Jill Burella does not allege any facts that would establish that the officers did anything other than fail to act. That failure, while deeply troubling and unquestionably tragic, does not give rise to a cognizable state-created danger claim.

## B. Equal Protection

Jill Burella asserts federal equal protection claims against the City (Count III) and the officers (Count IV). The District Court analyzed both claims together, concluding, first, that a reasonable jury could find that at the time of the shooting, there was an unlawful custom among Philadelphia police officers not to enforce orders of protection; and, second, that because the equal protection rights of domestic violence victims were clearly established during the period when Jill Burella reported the abuse to the Philadelphia Police Department, the officers are not entitled to qualified immunity. We disagree with the District Court and conclude that the officers are entitled to qualified immunity as to Jill Burella's equal protection claim.

In Hynson v. City of Chester, 864 F.2d 1026 (3d Cir. 1988), we held that to survive summary judgment, a plaintiff alleging an equal protection claim based on the unequal treatment of domestic violence victims

> must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom.

23

Id. at 1031. This, we said, "is the essence of the constitutional right which the plaintiff[] must show was clearly established at the time of the alleged violation in order to negate the police officers' qualified immunity."[18] Id.

In its analysis, the District Court identified three factual allegations that would support Jill Burella's claim that the Philadelphia Police Department had a custom or policy of providing victims of domestic violence with less protection than other victims of violence: (1) "police officers were confused as to their authority under the law to arrest violators of protection orders;" (2) "officers did not know whether to make an arrest for a violation of an order or to just advise the complainant of his or her rights;" and (3) "the City knew of the confusion among its police officers for some time prior to January 12, 1999, when the Plaintiff was shot."[19] Burella, 2003 WL 23469295, at *11.

As to evidence of discriminatory intent, the District Court observed that Jill Burella relied on (1) the deposition testimony of

---

[18] In her amended complaint, Jill Burella also alleges that the Philadelphia Police Department's "response to matters involving a police officer and/or spouse of a police officer were discriminatory polic[i]es and/or executed in a[] discriminatory manner." (App. at 74.) We note that the District Court did not rule on the issue of whether the City of Philadelphia or the officers treat victims of domestic violence who are spouses of police officers differently than other victims of domestic violence.

[19] Although this portion of the District Court's analysis was set forth in its discussion of Count II of the amended complaint, which asserted a due process claim against the City, the District Court relied on the same analysis to conclude that there was sufficient evidence of an unlawful custom for purposes of Jill Burella's federal equal protection claim. See Burella, 2003 WL 23469295, at *12. In addition, we note that the District Court rejected the argument that the Philadelphia Police Department's "Directive 90" is an affirmative policy that violates the Pennsylvania Protection from Abuse Act. Id. at *10-11.

24

Sergeant Francis Healy, the Special Assistant to the former Police Commissioner, who "stated that victims of domestic violence are predominantly women;" (2) an expert report prepared for purposes of the lawsuit that concluded that "the Philadelphia Police Department has discriminated against female victims of domestic violence;" and (3) "the manner in which the Police Department handled her own domestic abuse situation." Id. at *12. The District Court explicitly noted that Jill Burella "provide[d] no other support for the assertion that discrimination against domestic violence victims amounts to gender discrimination against women." Id.

With respect to the issue of causation, the District Court summarily concluded that "the causation inquiry is one of fact to be decided by a jury." Id.

Although the Philadelphia Police Department's apparent disregard of Jill Burella's numerous pleas for help raises a serious question as to whether this was but one example of a larger pattern of mishandling domestic violence complaints, we cannot agree that the factual allegations and evidence identified by the District Court are sufficient to satisfy the requirements set forth in Hynson. For example, in Hynson, we cited favorably to Watson v. Kansas City, 857 F.2d 690 (10th Cir. 1988), in which the Tenth Circuit concluded that a jury could infer discriminatory motive where the victim produced statistical evidence that nondomestic violence complaints were more likely to lead to arrest than domestic violence complaints. See Hynson, 864 F.2d at 1030; Watson, 857 F.2d at 696. In addition, there was evidence in Watson that police officers received training on how to "defuse" domestic violence situations, and were instructed to arrest the abuser as a last resort.[20] See Hynson, 864 F.2d at 1030; Watson, 857 F.2d at 696.

Similarly, in Brown v. Grabowski, 922 F.2d 1097 (3d Cir. 1990), we noted that plaintiff produced evidence showing that the individual officers named as defendants in the lawsuit had "dismal"

---

[20] Like George Burella, the abuser in Watson was a police officer. See Watson, 857 F.2d at 692.

25

records concerning domestic assaults. For example, one officer failed to file "a single domestic violence complaint or report" in the period between the enactment of the New Jersey domestic violence statute in 1982 and when the victim was murdered in 1985. Id. at 1117 n.12.

While statistical evidence and individual arrest records are not per se requirements in this context, such evidence may often be crucial. Indeed, in this case there is a marked absence of any comparable evidence (or even factual allegations) from which a reasonable jury could find an unlawful custom or infer a discriminatory motive. Therefore, we need not determine whether "a reasonable police officer" would have known that the conduct alleged violated Jill Burella's clearly established equal protection rights before concluding that the officers are entitled to qualified immunity on her claim.[21]

## V.    Conclusion

The facts Jill Burella alleges, if true, reveal a terrible deficiency on the part of the Philadelphia Police Department in responding to her complaints of domestic abuse. Binding precedent nevertheless compels our conclusion that the officers' failure to arrest her husband, or to handle her complaints more competently, did not violate her constitutional right to due process or equal protection of the law. Accordingly, we hold that the officers are entitled to qualified immunity on her constitutional claims.

We will reverse and remand to the District Court for further proceedings consistent with this opinion.

---

[21] We note that the District Court relied on its analysis of Jill Burella's federal equal protection claim to deny the officers and the City summary judgment on her state equal protection claim. See Burella, 2003 WL 23469295, at *13. Given our federal equal protection ruling, the District Court may determine on remand that it is necessary to reexamine the state claim.

State protection-from-abuse statutes seem to reside in a rock-solid castle of narrow construction barring any federal constitutional relief for the very victims that the statutes are designed to protect. I join my colleagues in their analysis of Jill Burella's substantive due process, equal protection, and state-created danger claims. I join them as well in the result they reach concerning procedural due process. My comments that follow address that issue.

In *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005), the Supreme Court reiterated its "continuing reluctance to treat the Fourteenth Amendment as a font of tort law." *Id.* at 768 (internal citations and quotation marks omitted). It held that Colorado's legislature had created no constitutionally protected entitlement to protection for victims of abuse because it did not truly mandate that police officers arrest violators of court-issued restraining orders. *Id.* at 760. "[A] true mandate of police action," the Court opined, "would require some stronger indication from the Colorado Legislature than 'shall use every reasonable means to enforce a restraining order' (or even 'shall arrest . . . or . . . seek a warrant')." *Id.* at 761 (quoting Colo. Rev. Stat. § 18-6-803.5(3)(a) & (b)).

Ms. Burella contends that Pennsylvania's Protection from Abuse Act of 1994 provided sufficiently clear indication of mandatory police action. While Pennsylvania's General Assembly has made a valiant effort to do so, I cannot submit that it has succeeded post-*Castle Rock*. Moreover, even if Pennsylvania's Protection Act created a substantive entitlement to mandatory police action, the officers here have qualified immunity because any such entitlement was not clearly established at the time of the events in question. Thus, for any claim to afford constitutional relief in preventing domestic violence and protecting future victims of abuse, Pennsylvania's legislators would need to go back to the drawing board.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 576 (1972). "To have a property interest in a benefit, a person clearly must . . . have a legitimate claim of entitlement to it." *Id.* at 577. Such entitlements arise from "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*; *see also Bishop v. Wood*, 426 U.S. 341, 345 (1976). To determine whether a certain interest rises to the level of a claim of entitlement that is constitutionally protected by the procedural due process requirements of the Fourteenth Amendment, we look to the nature rather than the weight of the interest at stake. *Roth*, 408 U.S. at 571; *see also Perry v. Sindermann*, 408 U.S. 593, 602 (1972); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). This means "specific benefits," *Roth*, 408 U.S. at 576, that are designed to benefit a plaintiff directly. *See Castle Rock*, 545 U.S. at 766.

*Castle Rock* addressed whether a Colorado statute setting police officers' duties in crimes relating to violations of court-issued restraining orders created a constitutionally protected property interest or entitlement for victims of abuse in that state's statutory scheme. *Id.* at 751. In concluding that Colorado created no such interest or entitlement, the Supreme Court reasoned primarily from the statutory language, which was not sufficient to overcome "[a] well established tradition of police discretion . . . with apparently mandatory arrest statutes." *Id.* at 760. Specifically, the Court held that the Colorado legislature failed to create a "truly . . . mandatory"[22] arrest statute because "shall" had

_____

[22] The *Castle Rock* majority notes that "in the specific context of domestic violence, mandatory-arrest statutes have been found in some States to be *more mandatory* than traditional mandatory-arrest statutes." 545 U.S. at 761, 762 (emphasis added). This language is awkward, as "mandatory" does not have gradations on a scale. An act is mandated, or it is not. In the same vein, Justice

28

been used elsewhere in Colorado arrest laws to mean "may," and because the statute explicitly gave police officers the option of arresting or seeking an arrest warrant. *Id.* at 761. The discretion granted police under the Colorado statute was particularly apparent in *Castle Rock*, where the suspected violator was not actually present. There was also nothing in the statute mandating that police pursue the violator to enforce the order; rather, they were to exercise their discretion in whether and how to pursue that violator or seek a warrant for doing so. *Id.* at 762. "[A] true mandate of police action," the Court opined, "would require some stronger indication from the Colorado Legislature than 'shall use every reasonable means to enforce a restraining order' (or even 'shall arrest . . . or . . . seek a warrant')." *Id.* (quoting Colo. Rev. Stat. § 18-6-803.5(3)(a) & (b)). In addition to the insufficiently strong language, the Colorado legislature had created no "true mandate" because the nature of the purported entitlement—arrest, seeking a warrant, or enforcement otherwise—was too indeterminate. *Id.* at 763. Finally, the Colorado "mandate" was lacking because the benefit to the victim of enforcement was collateral rather than direct, inasmuch as the statute made no provisions for the victim herself to initiate criminal contempt proceedings against the violator, keeping that prerogative in the hands of the state.

> Perhaps most importantly, the statute spoke directly to the protected person's power to 'initiate contempt proceedings against the restrained person if the order [was] issued in a civil action or request the prosecuting attorney to initiate contempt proceedings if the order [was] issued in a criminal action.' [Colo. Rev. Stat.] § 18-6-803.5(7). The

---

Stevens observed, "[t]he innovation of the domestic violence statutes was to make police enforcement . . . not 'more mandatory,' but simply *mandatory*." *Id.* at 784 (Stevens, J., dissenting) (emphasis in original).

29

protected person's express power to 'initiate' civil contempt proceedings contrasts tellingly with the mere ability to 'request' initiation of criminal contempt proceedings—and even more dramatically with the complete silence about any power to 'request' (much less demand) that an arrest be made.

*Id.* at 766.

In essence, *Castle Rock* recognized that a state statute *could* create a mandatory arrest scheme when the statutory language strongly signals an intent to curtail police discretion to enforce a protection order (1) with clearly commanding language, (2) by excluding the indeterminacies accompanying the option either to arrest or to seek a warrant, and (3) by creating a direct entitlement permitting the victim herself to pursue enforcement. The Pennsylvania Protection Act no doubt comes closer than Colorado in meeting these tests. Alas, it too fails.

The language of the Pennsylvania Protection Act differs markedly from Colorado's discretionary language. Unlike Colorado's law, Pennsylvania's statute did not simply state that "[a] peace officer *shall use every reasonable means to enforce* a protection order" and "*shall arrest, or*, if an arrest would be impractical under the circumstances, *seek a warrant*," Colo. Rev. Stat. § 18-6-803.5(3) (emphases added). Rather, the Pennsylvania Protection Act, when enacted in 1976, required no warrant where there was probable cause to believe that a suspect had violated a protection-from-abuse (PFA) order. Following amendments in 1994, the statute now provides that officers "shall arrest a defendant for violating an order." 23 Pa. Con. Stat. § 6113(a). This amended language restricts the window of discretion by omitting language granting officers the option to seek a warrant rather than to arrest. The 1994 amendments also permitted victims to pursue directly (although, as noted below, with limits) criminal prosecution of protection-order violators. 23 Pa. Const. Stat.

30

§ 6113.1 (providing for "private criminal complaints for violation of order"). In addition, violation of the PFA order itself became a crime—that of criminal contempt. 23 Pa. Con. Stat. § 6113(c). In effecting these three principal changes and some others, Pennsylvania provided deliberate and strong indication that it intended arrest to be mandatory under the statute.[23] No longer did it give police the option to arrest; it now commanded it.

The issue is whether this intent to mandate arrest can get around the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands," *Castle Rock*, 545 U.S. at 761, and particularly in light of the presumption that "*all* police officers must use some discretion in deciding when and where to enforce [statutes]." *City of Chicago v. Morales*, 527 U.S. 41, 62 n.32 (1999) (emphasis added). *Castle Rock* appealed to this presumption, "[t]he practical necessity for" which it deemed "particularly apparent [in that case] . . . where the suspected violator [wa]s not actually present and his whereabouts [we]re unknown." *Castle Rock*, 545 U.S. at 762.

To be sure, state and federal criminal statutes typically specify crimes and penalties without dictating the way law enforcement will arrest and prosecute suspected criminals, leaving that to the executive's discretion. But if courts recognize that it is ever possible for legislatures to mandate the police to arrest, as *Castle Rock* seemed to do, 545 U.S. at 761, I do not see why police officers' decisions in how to carry out their duty to arrest, or even their inability to arrest in certain situations should the perpetrator

---

[23] The statutory history shows a consistent pattern of increasing the scope of protection and enforceability of protection orders. For example, the 1994 amendments further created a right of action for civil contempt in § 6114.1 and recognized foreign protection orders in § 6118 (providing for "full faith and credit"). We note as well that amendments in 2001 incorporated the recognition of foreign protection orders into § 6113, thereby requiring arrest for "foreign protection order[s]" as well as Pennsylvania PFA orders.

be absent, compromise the extent to which a statute mandates arrest (as the Pennsylvania Protection Act purports to do). After all, the absence of the perpetrator in Pennsylvania would not lessen the statutory requirement to arrest him for violation of a PFA order; it would simply mean the impossibility of carrying out the mandate at some particular time.

If the Protection Act is read to mandate arrest, a byproduct of that mandate is of course the specification of a definite entitlement: arrest for a violation. *Castle Rock* noted that even if Colorado's statutory language required truly mandatory arrest, it did not create an entitlement because it did not grant the victim the right to bring a criminal action against the violator to enforce the order. 545 U.S. at 765–66. It instead permitted the victim to initiate *civil* contempt proceedings directly or to *request* initiation of *criminal* contempt proceedings. *Id.* at 766. This rendered any government's enforcement action "indirect and incidental" to the victim. *Id.* at 767 (quoting *O'Bannon v. Town Ct. Nursing Ctr.*, 447 U.S. 773, 787 (1980)).

The Pennsylvania General Assembly attempted to avoid this infirmity by granting the victim the right to initiate a criminal prosecution herself. While this gives hope to victims of abuse, my colleagues correctly point out that proceeding with any such suit is within the discretion of the local district attorney. Without commenting on the practical wisdom of stripping the district attorney of this discretion, it would need to be eliminated were the Protection Act amended further.

\* \* \* \* \*

Pennsylvania has enacted statutory provisions much stronger than those of Colorado to signal its intent to entitle Ms. Burella and other victims of abuse to redress the lack of enforcement of PFA orders. This laudable effort, which predates *Castle Rock*, does not meet that case's substantial roadblocks.

32

Further revisions to the Protection Act are required, but in no event will they help Ms. Burella. Moreover, I reluctantly concede my colleagues are correct to suggest that a legislature would be hard-pressed to draft around *Castle Rock* in light of the "well-established tradition of police discretion [that] has long coexisted with apparently mandatory arrest statutes." Maj. Op. at *17 (citing *Castle Rock*, 545 U.S. at 760). Although the Supreme Court has not held explicitly that a state legislature can never mandate arrest or that abuse-protection statutes can never create a constitutionally protected interest, the perception persists that few (if any) paths to those results are available. There is nothing left but to observe that

> [i]n light of [*Castle Rock*] and . . . *DeShaney* [*v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989)], the benefit that a third party may receive from having someone else arrested for a crime *generally* does not trigger protections under the Due Process Clause, neither in its procedural nor in its "substantive" manifestations.

*Castle Rock*, 545 U.S. at 768 (citations omitted) (emphasis added). The next version of the Protection Act to be written (if at all) by the Pennsylvania General Assembly requires resolving conflicts of policy—the protection of citizens and the discretion accorded police officers and district attorneys in carrying out that function. Moreover, even if the Act is amended to contain the strongest, most discretionless language, it may nonetheless succumb to challenge and prove to be a Potemkin village.[24]

---

[24] What then can be done? The answer may simply be to take this case out of a constitutional context and into one of state tort law. This, of course, would require a waiver of immunity under the Commonwealth's Political Subdivision Tort Claims Act. Currently under that Act, the Pennsylvania government asserts immunity from claims by individuals "on account of injury to a person or property caused by the act of [a] local agency or an employee thereof or any other person." 42 Pa. Con. Stat. Ann. § 8541. Eight

33

exceptions to governmental immunity are spelled out in 42 Pa. Con. Stat. Ann. § 8542. These exceptions currently do not provide for governmental liability for police officers' failure to protect victims of domestic abuse. *See generally Simmons v. City of Phila.*, 947 F.2d 1042, 1084–88 (3d Cir. 1991) (discussing immunity and liability under Pennsylvania's Political Subdivision Tort Claims Act).