**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1066
_____

LEWIS JAMES FOGLE

v.

JOHN SOKOL, Pennsylvania State Trooper;
MICHAEL STEFFEE, Pennsylvania State Trooper;
DONALD BECHWITH, Pennsylvania State Police Trooper;
JOSEPH STEPHEN, Pennsylvania State Police Trooper;
JOHN BARDROFF, Corporal;
ANDREW MOLLURA, Corporal;
GLENN WALP, Lieutenant, in their individual capacities;
COUNTY OF INDIANA, PENNSYLVANIA;
GREGORY OLSON, Indiana County District Attorney,
in his official and individual capacity;
WILLIAM MARTIN, Indiana County Assistant District
Attorney, in his individual capacity

County of Indiana, Pennsylvania, Gregory Olson and
William Martin,
Appellants
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania

(D.C. No. 2-17-cv-00194)
District Judge: Hon. David S. Cercone
_____

Argued September 19, 2019

Before: KRAUSE, MATEY, *Circuit Judges*,
and QUIÑONES ALEJANDRO,[*] *District Judge.*

(Filed: April 20, 2020)

Anna Benvenutti Hoffmann, Esq.
Emma K. Freudenberger, Esq.
Mary K. McCarthy, Esq.          [ARGUED]
Peter J. Neufeld, Esq.
Neufeld Scheck & Brustin
99 Hudson Street
8th Floor
New York, NY 10013

Thomas J. Farrell, Esq.
Farrell & Reisinger
300 Koppers Building
436 Seventh Avenue
Suite 300
Pittsburgh, PA 15219
        *Attorneys for Plaintiff-Appellee*

---

[*] Honorable Nitza I. Quiñones Alejandro, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Michael E. Kennedy, Esq.
Office of Attorney General of Pennsylvania
1251 Waterfront Place
Pittsburgh, PA 15222

> *Attorney for Defendants Donald Bechwith, Pennsylvania State Police Trooper; John Bardroff, Corporal; John Sokol, Pennsylvania State Police Trooper; Andrew Molllura, Corporal; Michael Steffee, Pennsylvania State Police Trooper; and Glenn Walp, Lieutenant, in their individual capacities*

Marie M. Jones, Esq.                    [ARGUED]
Maria N. Pipak, Esq.
Jones Passodelis
707 Grant Street
Gulf Tower, Suite 3410
Pittsburgh, PA 15219

> *Attorney for Defendants-Appellants County of Indiana; Gregory Olson, Indiana County District Attorney, in his official and individual capacity; and William Martin, Indiana County Assistant District Attorney, in his individual capacity*

_____

OPINION

_____

MATEY, *Circuit Judge*.

Lewis James Fogle spent more than three decades in prison for a crime he says he did not commit. Now free, he alleges that his incarceration was no accident, sketching a widespread conspiracy by law enforcement officials to violate his civil rights. Implicated in this alleged scheme are former Indiana County District Attorney Gregory Olson, former Indiana County Assistant District Attorney William Martin, and their one-time employer, Indiana County. They all raise the shield of absolute immunity, a judicially created exception to 42 U.S.C. § 1983. But the immunity from civil liability enjoyed by prosecutors hinges on the sanctity of our judicial process, not "any special esteem." *Kalina v. Fletcher*, 522 U.S. 118, 127 (1997) (internal quotation marks omitted). And so only truly prosecutorial functions, not investigative conduct, justify complete protection from suit. Fogle's complaint alleges acts by Olson and Martin that, taken as true, fall outside the narrow doctrine of absolute immunity and survive a motion to dismiss. Fogle's claims against Indiana County survive too because there is no exception to the final judgment rule allowing us to review municipal liability in this appeal. Thus, we will affirm the District Court's order denying Olson and Martin's motion to dismiss based on absolute immunity and dismiss Indiana County's appeal for lack of jurisdiction.

# I. BACKGROUND

We recount only the relevant history, accepting as true, as we must, the untested allegations in the complaint.

## A. The Crime and the Search

In 1976, a passerby discovered the body of fifteen-year-old Deann "Kathy" Long in a wooded area near her home in Indiana County, Pennsylvania. Kathy's death was senseless and horrific, involving a brutal assault, rape, and finally, a gunshot to the head. Swiftly, law enforcement opened an investigation with representatives from the Indiana County District Attorney's Office, including Olson and Martin (or collectively, "the Prosecutors"), and the Pennsylvania State Police (the "State Troopers"). The State Troopers soon learned from Kathy's sisters and family friends "that Kathy was last seen getting into a blue car with an unknown man" on the day of the crime. (App. at 44.) Two of her sisters, ages nine and twelve, described the man "as between 20 and 30 years old, with blue eyes, black hair that came below his ears and curled at the ends, sideburns, heavy eyebrows, and a heavy mustache over his upper lip."[1] (App. at 45.)

Lewis Fogle did not match the description, having "straight reddish-blonde hair that dropped down his back and a matching, full beard that reached his waist." (App. at 45.) But Fogle's brother Dennis owned a blue car, and rumors around town suggested he "invited a teenage girl to spend the night

---

[1] Kathy's older sister, Patty, and a friend of the family corroborated the two younger sisters' claim that they had seen Kathy get into the car with a man that evening.

with him the night after Kathy's body was found." (App. at 45.) It was a thin clue, and a search of Dennis's car "found nothing of evidentiary value." (App. at 46.)

A frustrating year passed with little progress. With no fresh leads, the investigation turned to Earl Elderkin, known in town as "'Spaceman,' because he claimed that he and his kids were from outer space." (App. at 46.) Elderkin had drawn attention from law enforcement in the days after the murder because he fit the description of the unknown man in the blue car. Though Elderkin first denied any connection to the crime, he eventually claimed to have been present during the attack. He offered an alleged eyewitness account, one short on details, perhaps owing to his use of drugs and alcohol. He confessed to being in the car that picked up a girl at the Long residence and witnessing an unidentified man shoot her with a rifle. But soon enough, Elderkin failed a polygraph examination, and the investigation slowed to a halt.

## B.     Fogle Becomes the Focus

More than three years passed with no leads. Then, Elderkin reappeared, checking himself into a hospital for a psychiatric evaluation. There, he asked to speak with police about Kathy and offered two more accounts. In one of these versions, he implicated sixteen unidentified men; in the other, he named two specific individuals, but neither was Lewis Fogle. And these new contradictory statements only diminished Elderkin's credibility. His stories included variations on the number of people involved in the murder and consistently referenced passengers in the blue car, a detail Kathy's sisters never mentioned. Even Elderkin agreed he was

6

unreliable, stating he was not sure whether he had witnessed a murder, or merely imagined the whole thing.

But the investigation pressed on. Olson, working with the State Troopers, turned to hypnosis to try to clarify Elderkin's stories. Olson's choice of expert was unusual: an English teacher with no formal hypnosis training. Unusual too was the actual hypnosis session, with the "hypnotist" acting "[a]t the behest of Defendants" to use "undue suggestion to obtain a statement from Elderkin." (App. at 48). But even that direction proved insufficient, as Elderkin waffled between versions of his earlier statements and a new story implicating, for the first time, both Dennis and Lewis Fogle. Following the hypnosis sessions, Olson and the State Troopers again interviewed Elderkin. And this time, he at last provided a firm statement naming the Fogle brothers as two of four attackers. That statement became the cornerstone of the investigation.

## C.      The Scramble to Bolster the Case Against Fogle

Elderkin's latest statement provided both a new theory and obvious challenges. For example, Elderkin's timeline of the crime did not fit the chronology provided by Kathy's sisters and friends. To advance their case, the State Troopers brought in Kathy's older sister, Patty, and one of Patty's friends, for a long interview. Eventually, under intimidation and threats of arrest by the State Troopers, they altered their story to align with Elderkin's latest story. At least for a time, as Patty's friend recanted her statement soon after leaving the station.

By using the combined statements of Elderkin and Patty Long, and without disclosing the wide-ranging inconsistencies, the State Troopers obtained criminal complaints against the

Fogle brothers and two others. Then, following hours of interrogation, threats, and a steady stream of suggestion in the form of details from Elderkin's statement, Dennis Fogle confessed and implicated his brother Lewis. The next day, after even more examination by Olson and the State Troopers, Dennis Fogle shaped his statement to fit with Elderkin's most recent account.

The case quickly began to unravel as the defendants discovered Elderkin's wandering and inconsistent theories had largely powered the criminal complaints. Timely support soon arrived from jailhouse informants recruited and counseled by the State Troopers. Working collaboratively with law enforcement, and pursuing promises of leniency, two of Lewis Fogle's cellmates claimed Fogle confessed to Kathy's murder. Olson and Martin "either knew about, encouraged, or permitted" this strategy. (App. at 54.) While the State Troopers characterized these statements as voluntary, they and the Prosecutors "hid" their role in pursuing the witnesses and their offers of favorable treatment. (App. at 54.)

In the meantime, the evidence continued to dissolve. A judge barred Elderkin from testifying and suppressed Dennis Fogle's confession. Quickly, the State Troopers obtained a new statement from yet another jailhouse witness, again by feeding him details and offering leniency. And as before, while Olson and Martin "knew about, encouraged, or permitted" this strategy, neither the defendants nor the court knew anything about their actions. (App. at 56.)

## D. Fogle's Conviction is Vacated

Without Elderkin's testimony or Dennis Fogle's confession, only the charges against Lewis Fogle proceeded to trial, some six years after Kathy's murder. A jury found Fogle guilty of second-degree murder, leading to a sentence of life imprisonment without the possibility of parole. In 2015, Lewis Fogle obtained DNA evidence excluding both himself and his brother Dennis as the source of semen collected from Kathy. On that basis, Lewis Fogle successfully vacated his conviction. Soon after, the Commonwealth declined to pursue new charges, describing the case as lacking "prosecutorial merit." (App. at 60.) Regrettably, no one has been convicted of the tragic rape and murder of Kathy Long.

## E. Fogle Brings a Civil Action

Following his release, Fogle sued a host of individuals and entities including the State Troopers,[2] Olson and Martin, and Indiana County. Fogle alleges that Olson and Martin violated his due process rights by fabricating inculpatory evidence and withholding exculpatory evidence, conspired to prosecute him without probable cause, and failed to intervene when others were violating his due process rights, all in violation of 42 U.S.C. § 1983. Separately, Fogle alleges that Indiana County's policies, practices, and customs amount to municipal liability under § 1983. Olson and Martin moved to dismiss, arguing prosecutorial immunity insulated their conduct from review. Indiana County moved to dismiss as well, arguing that it is not liable for Olson's alleged misconduct

---

[2] Fogle's claims against the State Troopers are not part of this appeal.

9

because the allegations do not stem from his role as a policymaker for the County, merely his work as a prosecutor.

The District Court granted the motion in part.[3] In a Memorandum Opinion, the District Court explained that Olson and Martin were not immune because the conduct alleged by Fogle was investigative, centered on building a case that consistently lacked probable cause. The District Court also found Fogle's allegations against the Prosecutors sufficiently grounded in official policymaking to state a claim against Indiana County under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). Olson, Martin, and Indiana County appeal that decision.

## II. OUR LIMITED JURISDICTION TO REVIEW DENIALS OF IMMUNITY

As a court of limited review, we begin by confirming our jurisdiction. The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291 to review "final decisions of the district courts." A final decision "does not necessarily mean the last order possible to be made in a case," and can include interlocutory

---

[3] Fogle also brought federal and state malicious prosecution claims (later withdrawn) and a *respondeat superior* claim (later dismissed).

10

appeals falling within the "collateral order" doctrine. *Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985).

### A. Fogle's § 1983 Claims Against Olson and Martin

The parties agree that we have jurisdiction over Olson and Martin's appeal. They are correct, and we may review an "interlocutory appeal of the District Court's order denying absolute . . . immunity . . . to the extent that the order turns on issues of law." *Yarris v. County of Delaware*, 465 F.3d 129, 134 (3d Cir. 2006); *see also Oliver v. Roquet*, 858 F.3d 180, 187–88 (3d Cir. 2017). Review of a district court's order denying a motion to dismiss on absolute immunity grounds is plenary.[4] *Yarris*, 465 F.3d at 134.

### B. Fogle's Municipal Liability Claim Against Indiana County

But the collateral order exception does not reach Indiana County's appeal. Unlike the claims against Olson and Martin, the County may not raise absolute immunity as a defense to a claim of municipal liability. *See Owen v. City of Independence*, 445 U.S. 622, 638 (1980). That is because a

---

[4] "We apply the same standard that district courts apply at the motion-to-dismiss stage, and our review is limited to the contents of the complaint and any attached exhibits. We are thus concerned with neither the accuracy of the facts alleged nor the merits of [Fogle's] underlying claims." *Yarris*, 465 F.3d at 134 (internal citation omitted). We also "construe the facts in the manner most favorable to [Fogle], in order to determine whether the state officials are entitled to absolute . . . immunity from any claims based on their alleged conduct." *Id*.

"municipality may not assert the good faith of its officers or agents as a defense to liability under § 1983." *Id.* So Indiana County cannot rely on the Prosecutors' alleged absolute immunity to defend against its own alleged violations of § 1983. So too, it cannot satisfy the exception to the final judgment rule for interlocutory review of an order denying absolute immunity. *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 37–38, 41–43 (1995); *see also In re Montgomery County*, 215 F.3d 367, 375–76 (3d Cir. 2000).

No other jurisdictional hook applies. As Indiana County's appeal does not arise from a final judgment or fall into the collateral order exception, it is premature, and we will dismiss.

## III. THE NARROW DOCTRINE OF ABSOLUTE IMMUNITY

Olson and Martin do not just deny Fogle's allegations. They argue that the truth of Fogle's claims does not matter, because as prosecutors they enjoy absolute immunity from the defense of civil actions and the "right not to stand trial." *In re Montgomery County*, 215 F.3d at 373. Fogle argues that the specific path Olson and Martin allegedly pursued during the investigation of Kathy's murder—characterized by investigation, not advocacy—lifts the veil of immunity at this stage. Parsing precedent in the fact-specific context of absolute immunity is notoriously tricky and turns not on black-letter rules, but on a "meticulous analysis" of the Prosecutors' actions. *Light v. Haws*, 472 F.3d 74, 79 (3d Cir. 2007). So we begin with the basics, looking to the history, purpose, and scope of the doctrine of absolute immunity. And with that context established, we conclude that Fogle has alleged claims based on actions by Olson and Martin outside the traditional

policy limitations that define absolute immunity. As a result, his complaint survives a motion to dismiss.

## A.      Absolute Immunity and § 1983

### 1.      The Legislative Background

The law now codified as 42 U.S.C. § 1983 was first passed by Congress in the Civil Rights Act of 1871.[5] The 1871 Act created a federal cause of action allowing citizens to sue a state or local official in federal court for violating "constitutional rights, privileges and immunities" through an "abuse of his position." *Monroe v. Pape*, 365 U.S. 167, 172 (1961); *see also Mitchum v. Foster*, 407 U.S. 225, 242 (1972). This new private right of action flowed from earlier attempts by Congress to use the powers granted by the Fourteenth Amendment to eradicate the lingering damage caused by slavery.[6] *Monroe*, 365 U.S. at 171. It targeted organized

---

[5] An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes, 17 Stat. 13 (1871) (codified as amended at 42 U.S.C. § 1983 (1996)); *see Briscoe v. LaHue*, 460 U.S. 325, 336–37 (1983); *see also* Cass R. Sunstein, *Section 1983 and the Private Enforcement of Federal Law*, 49 U. Chi. L. Rev. 394, 398–400 (1982). Congress amended the law and reenacted it as Section 1979 of the Revised Statutes of 1874. Rev. Stat. § 1979 (1874). *See Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 608 (1979).

[6] The 1871 Act built on the foundations of the Enforcement Act of May 31, 1870, 16 Stat. 140, which, in turn, built upon the Civil Rights Act of 1866, 14 Stat. 27. Sunstein,

13

terrorism against African Americans, including growing concerns that "Klan members and sympathizers controlled or influenced the administration of state criminal justice."[7] *Briscoe v. LaHue*, 460 U.S. 325, 337 (1983). Despite these legislative efforts, obstacles to the protections the Act offered to citizens quickly emerged.[8] But by the 1960s, the Supreme

---

*supra*, at 398–99. The 1871 Act authorized individual suits alleging deprivation of constitutional rights. *Chapman*, 441 U.S. at 608. Congress expanded the remedy to include violations of federal law in 1874. *Id*. at 608–09.

[7] The 1871 Act earned the name "the Ku Klux Klan Act." *See Chapman*, 441 U.S. at 628 (Powell, J., concurring); *see also Wilson v. Garcia*, 471 U.S. 261, 276 (1985) ("The specific historical catalyst for the Civil Rights Act of 1871 was the campaign of violence and deception in the South, fomented by the Ku Klux Klan, which was denying decent citizens their civil and political rights."); Cong. Globe, 42d Cong., 1st Sess. 244 (1871) (reprinting message from President Ulysses S. Grant to Congress seeking legislation to protect civil rights).

[8] One year after the 1871 Act's adoption, the Supreme Court narrowly confined the rights protected by the Fourteenth Amendment to those "which owe their existence to the Federal government, its National character, its Constitution, or its laws." *Slaughter-House Cases*, 83 U.S. 36, 79 (1872). Soon after, the Court held that "members of a white militia who had brutally murdered as many as 165 black Louisianans congregating outside a courthouse had not deprived the victims of their privileges as American citizens." *McDonald v. City of Chicago*, 561 U.S. 742, 808–09 (2010) (Thomas, J., concurring) (discussing *United States v. Cruikshank*, 92 U.S. 542 (1876)). And in 1883, the Court held that criminal

Court's incorporation of much of the Bill of Rights against the states meant that § 1983 again provided a federal remedy against state officials who abused their office by acting "under color of" state law.[9] 42 U.S.C. § 1983; *see* David Rittgers, Connick v. Thompson, *An Immunity that Admits of (Almost) No Liabilities*, 2011 Cato Sup. Ct. Rev. 203, 209–10 (2011). Along the way, a new barrier arrived in the form of judicially created immunities from suit.

---

conspiracy penalties in the 1871 Act could not apply against an individual participating in a lynching leading to one death and the beating of four men in state custody. *United States v. Harris*, 106 U.S. 629, 640 (1883). "The effect of such a narrow judicial construction of state action and 'privileges and immunities' on section 1983 was devastating." *Developments in the Law: Section 1983 and Federalism*, 90 Harv. L. Rev. 1133, 1161 (1977). Indeed, "[d]espite continuing infringement of the civil liberties of the freedmen and their descendants, virtually no actions were brought under the statute." *Id.*; *see also* Comment, *The Civil Rights Act: Emergence of an Adequate Federal Civil Remedy?*, 26 Ind. L. J. 361, 363 (1951) (noting only twenty-one cases brought under the relevant portions of the Third Civil Rights Act between 1871 and 1920).

[9] The phrase "by color of" dates to at least the thirteenth century and refers to an abuse of authority by a governmental official exceeding, rather than conforming to, the law. Steven L. Winter, *The Meaning of "Under Color of" Law*, 91 Mich. L. Rev. 323, 325 (1992).

2.     The Extra-Textual Origins of Immunity in
       § 1983 Actions

The text of § 1983 does not provide any immunities from suit. *Malley v. Briggs*, 475 U.S. 335, 342 (1986). Rather, "[i]t purports to subject '[e]very person' acting under color of state law to liability for depriving any other person in the United States of 'rights, privileges, or immunities secured by the Constitution and laws.'"[10] *Burns v. Reed*, 500 U.S. 478, 484 (1991) (second alteration in original) (quoting 42 U.S.C. § 1983). Yet in a line of cases dating back more than half a century, the Supreme Court "has consistently recognized . . . that § 1983 was not meant 'to abolish wholesale all common-law immunities.'" *Id*. (quoting *Pierson v. Ray,* 386 U.S. 547, 554 (1967)). Instead, the Court held that "[c]ertain immunities were so well established in 1871, when § 1983 was enacted, that 'we presume that Congress would have specifically so provided had it wished to abolish' them." *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quoting *Pierson*, 386 U.S. at 554–55). As a result, "§ 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976). "To that end, the Court has identified two kinds of immunities under § 1983: qualified immunity and absolute immunity." *Yarris*, 465 F.3d at 135. "Most public officials are entitled only to qualified immunity." *Buckley*, 509 U.S. at 268 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)). Under

---

[10] The clarity of the text prompted Justice Douglas to remark "[t]o most, 'every person' would mean *every person*, not every person *except* judges." *Pierson v. Ray*, 386 U.S. 547, 559 (1967) (Douglas, J., dissenting).

qualified immunity, "government officials are not subject to damages liability for the performance of their discretionary functions when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[11] *Id.* (quoting *Harlow*, 457 U.S. at 818).

### 3. The Functional Approach to Absolute Immunity for Prosecutorial Conduct

The absolute immunity extended to official actions was, for a time, grounded by a historical approach. Under this view, "some officials perform 'special functions' which, because of their similarity to functions that would have been immune when Congress enacted § 1983, deserve absolute protection from damages liability." *Buckley*, 509 U.S. at 268–69 (quoting *Butz v. Economou*, 438 U.S. 478, 508 (1978)). So courts looked for public officials shielded from civil suits at common law. Judges were an easy fit, as the Court found records of complete immunity dating back centuries. *See Bradley v. Fisher*, 80 U.S. 335, 346–48 (1871) ("The principle, therefore, which exempts judges of courts of superior or general authority from liability in a civil action for acts done by them in the exercise of their

---

[11] There is growing concern that the doctrine of qualified immunity has likewise "diverged from the historical inquiry mandated by the statute." *Ziglar v. Abassi*, 137 S. Ct. 1843, 1871–72 (2017) (Thomas, J., concurring); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting); *Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring in part and dissenting in part) (concluding "qualified immunity smacks of unqualified impunity").

judicial functions, obtains in all countries where there is any wellordered system of jurisprudence."); *see also Yates v. Lansing*, 5 Johns. 282, 291–92 (N.Y. Sup. Ct. 1810) (discussing judicial immunity in English common law); *Russell v. Richardson*, 905 F.3d 239, 248 (3d Cir. 2018). Jurors, too, had long been immune. *Imbler*, 424 U.S. at 423 n.20 ("The immunity of grand jurors, an almost equally venerable common-law tenet . . . also has been adopted in this country."); *Butz*, 438 U.S. at 509–10 (describing immunity extended to both grand and petit jurors). But prosecutors were a different story, as the modern office of a public prosecutor was uncommon in 1871.[12] *Kalina*, 522 U.S. at 124 n.11. So instead, courts departed from the historical approach, noting both the post-1871 "American cases addressing the availability of malicious prosecution actions against public prosecutors" and "the policy considerations underlying the firmly established common-law rules providing absolute immunity for judges and jurors." *Id.* At its core, absolute prosecutorial immunity was not born out of pre-§1983 tradition, but evolved

---

[12] *See also Kalina*, 522 U.S. at 132 (Scalia, J., concurring) ("There was, of course, no such thing as absolute prosecutorial immunity when § 1983 was enacted."). Rather, as scholars have found, the first judicial decision granting absolute prosecutorial immunity appeared more than twenty-five years after the passage of § 1983. *See* Margaret Z. Johns, *Reconsidering Absolute Prosecutorial Immunity*, 2005 BYU L. Rev. 53, 113–16 (2005) (citing *Parker v. Huntington*, 68 Mass. 124 (Mass. 1854); *Griffith v. Slinkard*, 44 N.E. 1001 (Ind. 1896)); *see also Kalina*, 522 U.S. at 123–24 (acknowledging prosecutorial immunity only relies "in part on common-law precedent").

as new common law reflecting "'a balance' of 'evils.'"[13] *Van de Kamp v. Goldstein*, 555 U.S. 335, 340 (2009) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)).

But there are limits placed on that balance scale. While the Supreme Court has extended the defense of absolute immunity to certain prosecutorial functions, it has not blanketed "the actions of a prosecutor . . . merely because they are performed by a prosecutor." *Buckley*, 509 U.S. at 273. Instead, courts must "focus upon the functional nature of the activities rather than [the prosecutor's] status" to determine whether absolute immunity is warranted. *Imbler*, 424 U.S. at 430; *accord Burns*, 500 U.S. at 486. Applying this functional approach, the Supreme Court has "emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns*, 500 U.S. at 486. Indeed, "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486–87.

That functional test separates advocacy from everything else, entitling a prosecutor to absolute immunity only for work "intimately associated with the judicial phase of the criminal process." *Id.* (quoting *Imbler*, 424 U.S. at 430). In that regard, the Court has found, for instance, that prosecutors are immune

---

[13] *See, e.g.*, *Yaselli v. Goff*, 12 F.2d 396, 406 (2d Cir. 1926) (holding prosecutors "should be no more liable to private suits for what they say and do in the discharge of their duties than are the judges and jurors"). The Supreme Court affirmed the decision in *Yaselli* in a per curiam opinion citing two cases on judicial immunity. *Yaselli v. Goff*, 275 U.S. 503 (1927).

from claims arising from their conduct in beginning a prosecution, *Imbler*, 424 U.S. at 431, including "soliciting false testimony from witnesses in grand jury proceedings and probable cause hearings," *Kulwicki v. Dawson*, 969 F.2d 1454, 1465 (3d Cir. 1992), presenting a state's case at trial, *Imbler*, 424 U.S. at 431, and appearing before a judge to present evidence, *Burns*, 500 U.S. at 491–92. *See also Van de Kamp*, 555 U.S. at 344 (finding prosecutors absolutely immune from claims arising from conduct "directly connected with the conduct of a trial" that "necessarily require[d] legal knowledge and the exercise of related discretion").

By contrast, a prosecutor's "investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Buckley*, 509 U.S. at 273. Determining the precise function that a prosecutor is performing is a fact-specific analysis. For instance, "[a] prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* at 274. Before probable cause for an arrest, a prosecutor's "mission at that time [i]s entirely investigative in character." *Id.* "Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination, . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n.5. It follows that when prosecutors function as investigators, rather than advocates, they enjoy no right to absolute immunity. *Id.* at 275–76; *see also Burns*, 500 U.S. at 495 (observing that absolute immunity is not so "expansive" as to protect all "direct participation in purely investigative activity"); *Kalina*, 522 U.S. at 129–31 (declining to extend absolute immunity

20

where a prosecutor makes a false statement of fact in an affidavit supporting an arrest warrant).

So to determine whether Olson and Martin may invoke absolute immunity as a complete bar to civil liability, we must parse these fine lines between advocacy and investigation. And while "[i]t is tempting to derive bright-line rules" from the Supreme Court's jurisprudence, we have "cautioned against such categorical reasoning" to "preserve the fact-based nature of the inquiry." *Odd v. Malone*, 538 F.3d 202, 210 (3d Cir. 2008); *see also Imbler*, 424 U.S. at 431 n.33. As a result, "our prosecutorial immunity analysis focuses on the unique facts of each case and requires careful dissection of the prosecutor's actions." *Odd*, 538 F.3d at 210. Although the fair distance from the ordinary language of § 1983 and "the 'functional categories' approach to immunity questions . . . make faithful adherence to the common law embodied in [it] very difficult," that is the path we must follow. *Kalina*, 522 U.S. at 135 (Scalia, J., concurring).

But it should not be easy travel. Once asserted, the onus is on the prosecutor to demonstrate "that absolute immunity should attach to each act he allegedly committed that gave rise to a cause of action." *Light*, 472 F.3d at 80. And that burden is uniquely heavy. *Odd*, 538 F.3d at 207 (quoting *Light*, 472 F.3d at 80–81). Indeed, "[a]sserting a[n] . . . immunity defense via a Rule 12(b)(6) motion subjects the defendant to a more challenging standard of review than would apply on summary judgment.'' *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). That is because in a motion to dismiss, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). Meaning to earn the protections of absolute immunity, a

21

defendant must show that the conduct triggering absolute immunity "clearly appear[s] on the face of the complaint." *Wilson v. Rackmill*, 878 F.2d 772, 776 (3d Cir. 1989).

Immunity, therefore, is neither one-size-fits-all, nor a one-way street. Our analysis "has two basic steps, though they tend to overlap." *Schneyder v. Smith*, 653 F.3d 313, 332 (3d Cir. 2011). First, we "ascertain just what conduct forms the basis for the plaintiff's cause of action." *Id.* Then, we "determine what function (prosecutorial, administrative, investigative, or something else entirely) that act served," *id.*, to determine whether the Prosecutors have carried their "burden of showing that such immunity is justified for the function in question," *Burns*, 500 U.S. at 486. Thus, while we tend to discuss prosecutorial immunity based on alleged *acts*, our ultimate analysis is whether a defendant has established absolute prosecutorial immunity from a given *claim*.

Using this framework, we conclude that Olson and Martin are not, at this stage, entitled to absolute immunity from Fogle's § 1983 claims if they relate to investigative, not prosecutorial, activity.

### B.     Applying the Functional Test to Olson and Martin's Absolute Immunity Defense

Does absolute immunity bar each of Fogle's § 1983 claims? The answer requires a "careful dissection of the prosecutor[s'] actions" that support Fogle's claims. *Odd*, 653 F.3d at 210.

Fogle raises several claims against Olson and Martin: violation of Fogle's due process rights by fabricating evidence

22

and withholding material exculpatory and impeachment evidence; civil rights conspiracy; and failure to intervene. All of these claims hinge on the same conduct: Olson and Martin's roles in obtaining statements from Elderkin, Patty Long, Dennis Fogle, and the jailhouse informants; their initiation of the prosecution against Lewis Fogle; and their concealment of their tactics from the court and from the defense. We will "carefully defin[e] [each] act that gave rise to [Fogle's] suit" in turn. *Odd*, 538 F.3d at 202.

### 1. Olson and Martin's Conduct in Procuring Elderkin's Statements

We start with the saga of Elderkin. Olson allegedly "arranged for an English teacher with no formal training in hypnosis to 'hypnotize' Elderkin." (App. at 48.) Then, Olson and the State Troopers directed "the 'hypnotist' [to use] undue suggestion to obtain a statement from Elderkin implicating" Fogle. (App. at 48.) Immediately afterward, working alongside the State Troopers, Olson took another statement from Elderkin and this time, "there were no longer large gaps in Elderkin's memory, the account was no longer hazy, and he expressed little uncertainty about what had occurred." (App. at 48.) It was this post-hypnosis statement that provided the probable cause to arrest Fogle.

Olson's role in obtaining Elderkin's statement constitutes investigatory conduct, a conclusion flowing from the Supreme Court's decision in *Burns v. Reed*. In *Burns*, a prosecutor claimed absolute immunity for providing police officers guidance on how to use hypnosis to obtain a witness statement. 500 U.S. at 482–83. The Supreme Court held that a prosecutor "advising the police in the investigative phase of a

23

criminal case" did not warrant absolute immunity. *Id.* at 493. Olson's conduct goes beyond advice, and allegedly included finding the hypnotist, encouraging undue suggestion, and participating in Elderkin's post-hypnosis questioning. By choreographing and securing Elderkin's statement, Olson played "the detective's role" to "search[] for the clues and corroboration," *Buckley*, 509 U.S. at 273, and establish probable cause to arrest Fogle. Those acts do not enjoy absolute immunity.

While Martin's alleged conduct stands in a different light, it leads to the same conclusion. The complaint alleges that "Defendants knew that Elderkin's post-hypnosis statement, like his previous statements, was wholly unreliable, untrustworthy, and entirely false" and "knew it was contradicted by evidence obtained earlier during the investigation." (App. at 49.) That could mean Martin was just as involved as Olson in shaping Elderkin's testimony. Or it might mean Martin learned of the discrepancies later, well into his preparation for trial. But recall that for Martin to succeed on a motion to dismiss based on absolute immunity, "the defense must clearly appear on the face of the complaint." *Wilson*, 878 F.2d at 776. While more scrutiny, and additional

facts, may produce a different result, Martin has not yet carried his burden.[14]

### 2. Patty Long's Statement

Fogle also alleges that "Defendants used improper tactics to obtain false evidence that would eliminate inconsistencies, corroborate Elderkin's statement and help them close the case." (App. at 50.) To accomplish that goal, Fogle claims, the State Troopers questioned Patty Long until she "adopted a new, false story, fed to [her]." (App. at 50.)

---

[14] We have recognized that where "a lack of factual specificity in a complaint prevents the defendant from framing a fact-specific qualified immunity defense, which, in turn, precludes the district court from engaging in a meaningful qualified immunity analysis[,] [t]he appropriate remedy is the granting of a defense motion for a more definite statement under Federal Rule 12(e)." *Thomas v. Independence Township*, 463 F.3d 285, 289 (3d Cir. 2006); *see also Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1321 n.10 (11th Cir. 2015). This rings equally true for invocations of absolute immunity. Courts should be mindful that where the allegations in a complaint do not require a more definite statement, immunity defenses will often require the benefit of discovery. *Russell*, 905 F.3d at 253 (quoting *Thomas*, 463 F.3d at 301) (noting "summary judgment remains a useful tool for precluding insubstantial claims from proceeding to trial"); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 775 (7th Cir. 2000) (Easterbrook, J., concurring in part and concurring in the judgment) ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground for dismissal."). We defer to the District Court to determine the best path.

Fogle then alleges that "[i]n the probable cause affidavit they presented to the magistrate judge," Olson and Martin failed to report the "past inconsistent statements of Patty Long." (App. at 51–52.) But failing to report the alleged inconsistencies while "appearing before a judge and presenting evidence" involves the Prosecutors' conduct as advocates, where they enjoy absolute immunity. *Burns*, 500 U.S. at 491. So the Prosecutors are entitled to absolute immunity for this conduct.

### 3. Dennis Fogle's Statement

Next, Lewis Fogle alleges that the State Troopers interrogated his brother Dennis twice in the twenty-four-hour period after his arrest. During the first interrogation, the State Troopers "worked to coerce a confession from Dennis" by "using threats, intimidation, and . . . feeding him non-public details from Elderkin's statement about the way the crimes supposedly had occurred." (App. at 52.) By the next day, Olson joined the fray and "used the same improper tactics to obtain another false and fabricated" statement from Dennis. (App. at 52.) And to cover up their misconduct, the Prosecutors collectively "misrepresented in written and oral reports that Dennis Fogle had volunteered the 'confession' and subsequent statement without coercion or suggestion." (App. at 52.)

Olson's claim of immunity for this conduct is temporal: he argues that since Dennis's interrogation occurred after arrest, the "judicial process was clearly in motion" entitling him to immunity. (Opening Br. at 20.) But "[w]e have rejected bright-line rules that would treat the timing of the prosecutor's action (*e.g.* pre- or postindictment), or its location (*i.e.* in- or out-of-court), as dispositive." *Odd*, 538 F.3d at 210. That approach sensibly counsels that we "not view the filing of a

26

complaint as a foolproof measure of the commencement of 'quasi-judicial' activity." *Kulwicki*, 969 F.2d at 1466. Instead, the "key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the underlying function that the investigation serves and the role the [prosecutor] occupies in carrying it out." *B.S. v. Somerset County*, 704 F.3d 250, 270 (3d Cir. 2013).

As alleged, Olson's conduct in interviewing Dennis Fogle was not that of an advocate. Rather, the interview occurred at the end of a long chain of investigative events led, or supervised, by Olson. Recall that without Elderkin's hypnotic recollections, there may have been no probable cause for Dennis Fogle's arrest. Allegedly, Olson knew this; indeed, Lewis Fogle claims Olson's active participation fueled the entire investigation. For that reason, Olson was not acting as an advocate "interviewing witnesses as he prepare[d] for trial"; instead, he was investigating the theory of his case by "searching for . . . clues." *Buckley*, 509 U.S. at 273. On that basis, and at this stage, Olson does not receive absolute immunity for his role in obtaining Dennis Fogle's statement or concealing the methods leading to his confession.

Less clear are Martin's interactions with Dennis Fogle. The complaint alleges that "Defendants misrepresented in written and oral reports that Dennis Fogle had volunteered the 'confession' and subsequent statement without coercion or suggestion, and otherwise hid their misconduct with respect to Dennis Fogle's statements." (App. at 52–53.) Based on this assertion, Martin may have functioned as an advocate, an investigator, or played no role at all. While discovery may produce a different result, at this stage, Martin has not carried his burden to enjoy the protections of absolute immunity for

27

his conduct related to Dennis Fogle's confession. *See Yarris*, 465 F.3d at 138 (holding that, where it is not clear from a complaint whether a prosecutor's action was investigative or quasi-judicial, a motion to dismiss based on absolute immunity is properly denied).

### 4. Statements by the Jailhouse Informants

Fogle alleges that Olson and Martin "knew about, encouraged, or permitted" the State Troopers to fabricate statements from three jailhouse informants, each describing Fogle's purported confession to the crime. (App. at 54, 56.) Again, Olson and Martin assert that absolute immunity protects this conduct because it "occurred after the initiation of criminal charges." (Opening Br. at 18.) And again, relying on our decision in *Yarris*, the Prosecutors call for a bright line extending absolute immunity to all conduct surrounding informants after the filing of charges. But once again, that line is unsupported by our precedent.

Our role is not to look at the "timing of the prosecutor's action (*e.g.* pre- or postindictment)," but at the function being performed. *Odd*, 538 F.3d at 210. In *Yarris*, after closely reviewing the facts, we held that the prosecutors were entitled to absolute immunity from a claim that they had obtained a false statement from a jailhouse informant. 465 F.3d at 139. Our conclusion turned on the attorneys' work in preparation for trial with the prosecutors acting as "advocates rather than investigators." *Id.* In contrast, Fogle alleges that the Prosecutors not only solicited false statements from jailhouse informants, but deliberately encouraged the State Troopers to do the same "[k]nowing their evidence was weak" (App. at 53), given the fabricated (Elderkin), inconsistent (Kathy's sister

and friend), and coerced (Dennis Fogle) witness statements. Thus, the Prosecutors were functioning not as advocates, but as investigators seeking to generate evidence in support of a prosecution. This illustrates why "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards," because "[w]hen the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same." *Buckley*, 509 U.S. at 274 n.5, 276. Accepting the facts alleged as true and drawing all inferences in favor of Fogle, neither Olson nor Martin have carried their burden to demonstrate that they are entitled to absolute immunity for this conduct at this stage.

5.     The Prosecutors' Conduct at Hearings and Trial

Finally, some of Fogle's claims rest on a host of actions within the Prosecutors' duties as advocates during the judicial process. He alleges that at hearings and at trial the Prosecutors withheld material exculpatory evidence from defense counsel, the court, and the jury; filed a criminal complaint without probable cause; and committed perjury before and during trial. These activities are "intimately associated with the judicial phase of the criminal process." *Burns*, 500 U.S. at 486 (quoting *Imbler*, 424 U.S. at 430). And all enjoy absolute immunity. *See id.* at 487–92 (wrongful prosecution); *Imbler*, 424 U.S. at 431 (beginning prosecution and presenting the state's case); *Smith v. Holtz*, 210 F.3d 186, 199 n.18 (3d Cir. 2000) (withholding evidence); *Davis v. Grusemeyer*, 996 F.2d 617, 630 n.28 (3d Cir. 1993) (perjury), *overruled on other grounds by Rolo v.*

29

*City Investing Co. Liquidating Tr.*, 155 F.3d 644 (3d Cir. 1998).

## IV. CONCLUSION

In sum, Olson and Martin are absolutely immune only for their alleged conduct in launching the prosecution against Fogle, failing to include information about Patty Long's previous statements in their probable cause affidavit, withholding material exculpatory and impeachment evidence, and making misrepresentations to the court. But Olson and Martin are not, at this stage, entitled to absolute immunity for their alleged conduct in procuring Elderkin's statements, Dennis Fogle's confession, or the jailhouse informant statements. As these actions implicate all of Fogle's claims, we will affirm the District Court's decision to deny dismissal based on absolute immunity. We leave for the District Court on remand to determine which of Fogle's claims against Olson and Martin survive on the merits. And, of course, Olson and Martin are still entitled to seek qualified immunity.

Our decision offers little to celebrate. Lewis Fogle can move forward with some, but not all, of the allegations in his complaint against the Prosecutors. The Prosecutors must explain some, but not all, of their choices. And decades later, answers and earthly peace still elude Deann "Kathy" Long and her grieving family. But the doctrine of absolute immunity is fact-bound, seeking to pinpoint the moments when investigation becomes advocacy, with the curtain of immunity raising and lowering in response. Although absolute prosecutorial immunity exceeds both the doctrine's historic scope and the statutory text, we cannot use the original meaning of a statute as a "makeweight" against precedent,

30

*United States v. Johnson*, 921 F.3d 991, 1002 (11th Cir. 2019), nor hand-pick binding decisions to follow. *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016). So we will affirm the District Court's order denying Olson and Martin's motion to dismiss based on absolute immunity as far as the claims depend on non-prosecutorial activities and dismiss Indiana County's appeal for lack of jurisdiction.